**UNITED STATES of America, Plaintiff,**

v.

**Marvin M. TRAGASH, Defendant.**

**No. CR–1–87–095.**

United States District Court,
S.D. Ohio, W.D.

May 16, 1988.

4.

Kathleen Brinkman, Asst. U.S. Atty., for plaintiff.

Thomas W. Miller, Cincinnati, Ohio (local counsel), Robert N. Scola, Jr., Coral Gables, Fla., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HERMAN J. WEBER, District Judge.

This matter is before the Court upon defendant's Motion to Suppress (doc. no. 10), the response by the United States (doc. no. 12) and the evidence received at the evidentiary hearing held on December 21 and 22, 1987. The parties filed briefs and Proposed Findings of Fact and Conclusions of Law on March 4, 1988. Upon consideration of all submissions and after observing the demeanor and hearing the testimony of defendant and Troopers Schaffner and Torres at the suppression hearing, the Court makes the following Findings of Fact and Conclusions of Law.

### I. Statement of the Facts

At approximately 3:45 P.M. August 12, 1987, State Highway Trooper Clifford L. Schaffner was driving northbound on Interstate 75 in the vicinity of the north city

limits of Dayton, Ohio in a marked patrol car. He observed a vehicle which appeared to be speeding, passing other traffic by using multiple lane changes, and failing to use its turn signal.

By the time Trooper Schaffner reached the vehicle, I–75 narrowed to two lanes northbound and then expanded to three. As he closed on defendant's vehicle, defendant saw him in his rear-view mirror. Mr. Tragash slowed down but straddled the white lane marks separating the left from the middle lane. Tragash then returned to the left lane. Trooper Schaffner attempted to overtake the vehicle to determine whether the driver was intoxicated, sleepy, or otherwise impaired.

Continuing to follow Tragash, Trooper Schaffner observed that the car was a silver Chevrolet Caprice with a Dade County license plate. The "Y" on the plate indicated that the vehicle was probably a rental car. A tissue box was visible on the front dash board. Tragash continued to make erratic lane shifts without signaling despite the presence of the patrol car behind him. There was no apparent reason for these lane changes and Tragash did not pass any other vehicle. Although Tragash's driving was not endangering any other vehicle at this point, Trooper Schaffner determined to stop him. First, however, Trooper Schaffner called the Highway Patrol dispatcher and discovered that the vehicle was rented. It was not until he received this information from the dispatcher that he stopped Mr. Tragash. It was at that point Trooper Schaffner also suspected the vehicle was involved in transporting drugs.

In February, 1987, Trooper Schaffner took a course at the State Highway Patrol Training Academy concerning "characteristic indicators of a possible drug courier." Trooper Shaffner testified that he suspected Tragash of being a drug courier because 1) he was driving a GM car, 2) the vehicle was rented, 3) the vehicle was rented out of Miami, Florida, a source city, 4) the driver was the sole occupant of the vehicle, 5) the sudden speed change when Trooper Schaffner approached him and 6) the presence of the tissue box.

After stopping Tragash, Trooper Schaffner walked up to Tragash's car and asked to see his driver's license. Tragash produced a valid Florida license which showed his true name and a Miami, Florida address. Trooper Schaffner observed a cooler in the front seat, the tissue box on the dash board, tissues scattered around the front seat, various fast-food items and a pillow.

Trooper Schaffner told Tragash that he was giving him a warning for straddling a lane and failure to signal. Tragash stated in response to questions by Schaffner that the car was rented and that he left his car with his wife in Florida. Trooper Schaffner asked him where he was headed and Tragash said he was going to visit his daughter in Saginaw, Michigan. As the conversation continued, Tragash became increasingly nervous. Based on his earlier suspicions, his observation of the interior of the car, and this nervous reaction, Trooper Schaffner asked him point blank whether he was "hauling any drugs in the car." Tragash got very nervous, looked down and paused for a brief moment before looking back at Schaffner and saying "no."

Trooper Schaffner then asked defendant if he could look through his car. Tragash responded, "I don't care." Tragash also gave him the rental agreement for the vehicle. Trooper Schaffner asked defendant to step out of the vehicle and sit in the back of the patrol car. As defendant exited the vehicle, he took the keys from the ignition and put them in his pocket. Trooper Schaffner did a quick frisk search of defendant. Nothing was found.

When Tragash was seated in the right rear seat of the patrol car, Trooper Schaffner filled out a Consent to Search form and asked Tragash to review it before the backup officer arrived and Trooper Schaffner searched the vehicle. Trooper Schaffner called for another Trooper to back him up at the scene. Tragash was presented with the Highway Patrol form by which consent to search a vehicle may be given in writing. Tragash took a considerable amount of time to review the consent form and appeared to labor over each sentence. The

form clearly stated that the vehicle, including luggage and contents, would be searched. The form also clearly stated that Tragash had the right to refuse to consent to the search and the right to refuse to sign the form. When Tragash reviewed the form, he told Trooper Schaffner that he would rather not sign the form because his attorney told him never to sign anything. Trooper Schaffner explained that he had to have Tragash's consent or he could not look through the vehicle, that the form was a mere formality, but without Tragash's consent, Schaffner would have to get a warrant in order to search the vehicle. When Trooper Schaffner asked whether it was still okay to search the vehicle, Tragash said it was "okay" but he would rather not sign the form.

At this time, approximately 4:00 P.M., Trooper A.J. Torres arrived at the scene to act as back-up. Trooper Schaffner instructed Trooper Torres to stay in the patrol car with Tragash while he conducted the search of the vehicle. Before beginning the search, Trooper Schaffner asked Tragash one more time in the presence of Trooper Torres, if he consented to the search. Tragash said "its okay." Neither Trooper Schaffner nor Trooper Torres gave Tragash his Miranda warnings prior to this request and Tragash was not informed specifically of his right to refuse the search or his right to leave the scene at this time.

Trooper Schaffner then searched the passenger compartment of Tragash's rental vehicle but found no drugs or any other incriminating evidence.

Trooper Schaffner returned to the patrol car and asked Tragash for the keys to the vehicle so he could look into the trunk. Tragash reached into his pocket and gave Trooper Schaffner the keys. Trooper Schaffner observed that Tragash was quite nervous, more nervous than before when Trooper Schaffer had asked Tragash if he had any drugs in the car, but Tragash did not protest nor did he withdraw his consent to the search of the vehicle at this time.

Trooper Schaffner opened the trunk and observed a piece of luggage, a garment bag and a gym bag. He opened the gym bag and inside observed "a brown grocery-size bag that the top had been folded over and masking tape closed." He ripped open the wrapped package and found three smaller packages wrapped in newspaper. Each was about six inches by eight to 10 inches by four inches and were numbered. In the grocery bag with the three packages was a yellow piece of paper with numbers on it. During his Highway Patrol training, Trooper Schaffner had seen similar packages which were drugs packaged for transport.

Trooper Schaffner turned around and held up one of the smaller packages for Trooper Torres and Tragash to see and then returned them to the gym bag. He brought the gym bag and its contents back to the patrol car. By this point, Mr. Tragash was becoming physically ill. He was flushed and grasping at his throat and drooling from the sides of his mouth. Trooper Torres read Tragash his Miranda warnings and radioed a supervisor. After reading Tragash his warnings, Trooper Torres asked him if understood them. Mr. Tragash nodded and grunted "um-hum." Mr. Tragash informed the Troopers that he had high blood pressure and indicated he had medication in the front seat of his car, whereupon a Trooper went to get it.

After allowing Tragash to take the medication, the Troopers began to question him about his role in this delivery, the overall operation and prior experience in this type of activity. Tragash denied knowing what was in the bag and indicated that he was just given the bag and told to deliver it to someone in Saginaw, Michigan. Trooper Schaffner then asked him who gave him the bag but Mr. Tragash began shaking his head and would not answer. Trooper Schaffner then stopped questioning him. Tragash did not ask for an attorney.

The Troopers' Supervisor, Lt. Kobi, arrived at the scene at about 4:20 P.M. Trooper Schaffner explained what had occurred and began taking photographs of the scene. Lt. Kobi got Tragash out of the car, handcuffed him and frisked him more thoroughly than before. Nothing else was found. After securing the vehicle and tak-

ing additional photographs, Trooper Schaffner drove Tragash to the Troopers' post.

During the ride, Trooper Schaffner asked Tragash additional questions about who gave him the package and to whom he was going to deliver it. Tragash did not respond to these questions. When asked how he had gotten involved, Tragash said "Well, you go to Florida, you meet people." Tragash also told Trooper Schaffner he had been investigated and arrested by the F.B.I. in the past.

Trooper Schaffner and Tragash arrived at the post after 6:00 P.M. Trooper Baskin was at the front desk. Advised that Tragash had previously been given his Miranda warnings, he did not give Tragash additional ones. Trooper Baskin pointed to the contents of one of the packages revealing a white substance, and asked Tragash, "What's this stuff?" Tragash replied, "Cocaine, I guess."

Tragash was then interviewed by another Trooper, Trooper Sycks. During the interview, Tragash acknowledged that he had once been arrested by the F.B.I. in an investigation concerning his brother but the charges were dropped. Trooper Sycks read Mr. Tragash his Miranda warnings again at 7:23 P.M. and showed him a Waiver of Rights form. Tragash signed his initials after each right indicating that he understood them but refused to sign the waiver portion at the end of the form. After having been read his Miranda rights, Tragash refused to talk further and asked for an attorney, whereupon the interrogation ceased.

The Troopers obtained a search warrant the following day, August 13, 1987. The vehicle was partially dismantled during the search but no additional drugs were found. The Troopers seized Tragash's checkbook, an address book, pads of paper and other documents from the passenger compartment of the vehicle and from the inside of the luggage.

## II. Conclusions of Law

The issues raised by the Motion to Suppress, as developed by the facts presented during the suppression hearing, concern the legality of the initial stop of defendant's vehicle, the continued detention of defendant, the legality of the search of the vehicle, and the admissibility of statements made by defendant in the patrol car, at the time of the traffic stop, and back at the post.

■ At the outset, the Court determines that defendant has standing to challenge the warrantless search of the vehicle and his luggage. Since defendant had rented the vehicle and possessed the keys to the trunk, he had a subjective expectation of privacy that society is prepared to accept as reasonable which would confer standing to raise a fourth amendment challenge to the Trooper's search. *United States v. Sanders,* 719 F.2d 882, 885 (6th Cir.1983); *United States v. Place,* 462 U.S. 696, 705, 103 S.Ct. 2637, 3643, 77 L.Ed.2d 110 (1983); *United States v. Tolbert,* 692 F.2d 1041, 1044 (6th Cir.1982), *cert. denied,* 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983).

The Supreme Court of the United States has set forth the manner in which a trial court should review the lawfulness of a traffic stop such as the one in this case. In *Delaware v. Prouse,* 440 U.S. 648, 653–54, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979), the Supreme Court held:

> The fourth and fourteenth amendments are implicated in this case because stopping an automobile and detaining its occupants constitute a seizure within the meaning of those amendments even though the purpose of the stop is limited and the resulting detention quite brief. *United States v. Martinez–Fuerte,* 428 U.S. 543, 556–58 [96 S.Ct. 3074, 3082–83, 49 L.Ed.2d 1116] (1976); *United States v. Brignoni–Ponce,* 422 U.S. 873, 878 [95 S.Ct. 2574, 2578, 45 L.Ed.2d 607] (1975); cf. *Terry v. Ohio,* 392 U.S. 1, 16 [88 S.Ct. 1868, 1877, 20 L.Ed.2d 889] (1968). The essential purpose of the prescriptions in the fourth amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials including law enforcement agents ... thus the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's

fourth amendment interests against its promotion of legitimate governmental interests.

■ The Court finds that the stop of defendant's vehicle in this case was reasonable and lawful as it was supported by probable cause to believe that defendant had violated Ohio Rev.Code §§ 4511.33 and 4511.39 and a reasonable, articulable suspicion that defendant was intoxicated, sleepy, or otherwise impaired and dangerous to fellow motorists. It is important for the protection of other users of the highways that such actions be investigated by safety officers in order that accidents be avoided. This governmental interest in decreasing the already staggering amount of highway fatalities and injuries far outweighs the inconvenience to the individual of a brief stop.

■ Law enforcement officers are permitted to conduct a brief investigatory stop of a vehicle. The stop, however, must be supported by specific articulable facts sufficient to give rise to a reasonable suspicion of criminal activity. *Delaware v. Prouse, supra; Terry v. Ohio, supra; United States v. Tolbert, supra.* Courts must apply objective standards in determining whether at the time of the stop the requisite degree of suspicion existed. *Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979). Whether a fourth amendment violation occurs depends upon "an objective assessment of the officer's actions" and not upon his "actual state of mind." *Maryland v. Macon,* 472 U.S. 463, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985). In this case, all of the evidence suggests that a reasonable officer would have stopped the defendant. Trooper Schaffner observed him driving erratically for some time and although defendant was not as yet endangering any other vehicle, it was a distinct possibility, if not probability, that he would, were he to reach heavier traffic. Trooper Schaffner personally observed violations of several code sections and a possible violation of yet another. The fact that Trooper Schaffner's interest in the vehicle was further aroused by certain characteristic indicators of a "drug courier" does not lessen the lawfulness of the stop. Once a lawful stop was made and the traffic violations resolved, Trooper Schaffner could and did lawfully act on his suspicions regarding the indicators.

■ The Court finds that the subsequent detention and questioning of the defendant did not rise to the level of an arrest requiring probable cause and did not violate the fourth amendment. *United States v. Knox,* 839 F.2d 285 (6th Cir.1988); *United States v. Blanco,* 844 F.2d 344 (6th Cir. 1988); *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); *United States v. Renfro,* 620 F.2d 569, 574–75 (6th Cir.), *cert. denied,* 449 U.S. 902, 101 S.Ct. 274, 66 L.Ed.2d 133 (1980). In this case, the intrusion on the defendant's privacy was so much less severe than that involved in a traditional arrest that the opposing interests in crime prevention and detection and in the police officer's safety could support the seizure as reasonable. *Michigan,* 452 U.S. at 697, 101 S.Ct. at 2591 quoting from *Dunaway v. New York,* 442 U.S. 200, 209, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979).

In addition, the Troopers' conduct was not more intrusive than necessary. *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). The Court must, however, examine the character of the official intrusion and its justification. In assessing the justification, the Court must analyze the law enforcement interest, including the legitimate law enforcement interest of preventing flight in the event incriminating evidence is found and the minimizing of the risk of harm to officials, and the nature of the articulable facts supporting the detention.

■ Of prime importance, in this case, is the fact that after a very short stop of several minutes, Trooper Schaffner asked the defendant for his consent to search and the defendant consented without hesitation. An officer who makes a lawful stop of a vehicle has the right to ask for consent to search the vehicle if he suspects the presence of contraband. *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *United States v. Collis,* 766 F.2d 219, 221 (6th Cir.), *cert. de-*

*nied,* 474 U.S. 851, 106 S.Ct. 150, 88 L.Ed.2d 124 (1985). Trooper Schaffner first resolved the issue of whether he would warn or cite defendant for his traffic violations. Trooper Schaffner determined that defendant was not intoxicated, gave defendant a verbal warning and only then did Trooper Schaffner make an inquiry of defendant in an effort to resolve his suspicion that defendant might be a drug courier. Trooper Schaffner acted lawfully in every respect in asking defendant for permission to search the vehicle and its contents in order to resolve the suspicion he held.

■ Further, defendant again, without any protest, agreed to sit in the back of the patrol car. The officer's justification for requesting that he sit there was also reasonable. First of all, since Trooper Schaffner was searching defendant's car, it was the only place defendant could sit. Secondly, although perhaps unlikely in this case, there was the possibility that defendant would attempt to flee if some incriminating evidence were found. Lastly, and most important, Trooper Schaffner was alone on the side of Interstate 75 with a man whom he had reason to believe was involved in criminal activity. Considering a driver involved in a minor traffic accident is usually placed in the back of a patrol car during the investigation, it is reasonable for a Trooper to request a person who has just consented to a search of his car for drugs to sit in the same place.

■ The Trooper possessed a reasonable and articulable suspicion that defendant was engaged in criminal activity, when assessing all of the circumstances surrounding the actions of the suspected wrongdoer. *United States v. Knox,* 839 F.2d 285 (6th Cir.1988); *United States v. Williams,* 754 F.2d 672 (6th Cir.1985). The Court finds the following factors to be relevant and sufficient: 1) defendant was driving a large rented car, 2) the car was rented in Miami, Florida, a source city, 3) the defendant was the sole occupant of the vehicle, 4) defendant had obviously stayed in or near the car at all times, and 5) defendant became increasingly nervous when asked about his destination. Although the Trooper could have undoubtedly hypothesized countless innocent explanations, it was not unreasonable for him to conclude that the most likely explanation was that defendant fit a pattern of narcotics couriers who drive drug loads straight through from Florida for distribution in the mid-western states.

■ It is well settled that a person may waive his or her fourth amendment rights by consenting to a search. *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968); *Davis v. United States,* 328 U.S. 582, 593, 66 S.Ct. 1256, 1261, 90 L.Ed. 1453 (1946). The consent must be voluntary, that is, freely and intelligently given. The existence and voluntariness of a consent is a question of fact. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Scott,* 578 F.2d 1186, 1189 (6th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 201, 58 L.Ed.2d 182 (1978). The Supreme Court held in *Schneckloth* that voluntariness is to be determined from the totality of the surrounding circumstances. It is not necessary that the defendant know or be told that he can refuse to consent to the search, nor must it be shown that there was a knowing and intelligent waiver of the right to refuse to consent. The government is required to prove that consent was in fact voluntarily given and not the result of duress or coercion expressed or implied. *Schneckloth,* 412 U.S. at 248, 93 S.Ct. at 2058. The fact that a defendant is carrying drugs when asked to consent to a search does not preclude a finding that he consented. *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Consent may be in the form of words, gestures or conduct. *Robins v. MacKenzie,* 364 F.2d 45, 48–49 (1st Cir.), *cert. denied,* 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140 (1966).

■ The Court finds that defendant's consent to search the vehicle was voluntarily, freely and intelligently given. The Trooper did not detain defendant more than was reasonably necessary to determine that defendant was not a danger to others on the highway. The officer had drawn no

weapon and had courteously warned defendant about his traffic violations and briefly questioned him. The Trooper testified that he was surprised that defendant consented to the search. Defendant had knowledge of police procedures at the time of the search based on his involvement with his brother's troubles with the F.B.I.

The Court rejects defendant's argument that this consent could not have been freely given because defendant knew he was carrying drugs. The Court believes, viewing the evidence in its totality, that at this point, defendant began a calculated gamble which did not pay off. The Supreme Court has suggested what subjective forces impel a defendant to consent to a search when he knows its results may incriminate him:

"Among these are the simple but often powerful convention of openness and honesty, the fear that secretive behavior will intensify suspicion and uncertainty as to which course is more likely to be helpful...."

*Schneckloth*, 412 U.S. at 234 fn. 15, 93 S.Ct. at 2051 fn. 15. It is clear to this Court that neither coercion nor duress prompted defendant to consent in this case. It was defendant's desire to appear to be cooperative in the hope that Trooper Schaffner would lose interest, make a non-thorough search, or even perhaps be called away by another more pressing assignment. If he pretended he had nothing to conceal, it would be reasonable to hope that the drugs might not be found. Further evidence of this is that Tragash intentionally took the keys out of the ignition when he got out of the car. Having consented to the search of the passenger compartment and acting with apparent openness, defendant knew that Trooper Schaffner would not find anything incriminating in the front of the car and hoped that it would be possible to avoid a search of the trunk.

In keeping with his appearance of total cooperation, Tragash further acquiesced in the Trooper's request to pat him down and to sit in the back of the patrol car. When presented with the consent form prepared by Trooper Schaffner, defendant took the a further, more calculated step in his gamble to avoid prosecution by not signing the consent form but giving only a verbal consent to the search hoping, if necessary, to escape on a technicality later in the case. He repeated his consent in Trooper Torres presence when asked again whether it was okay to search the car, still believing that if he was cooperative, the search might go no further. When asked for the keys to the trunk, defendant gave them to Trooper Schaffner. He at no time withdrew the consent he had freely given to the search and never questioned whether he could leave. Neither of the Troopers threatened defendant, used loud or abusive language, or brandished a weapon. Defendant never asked if he could leave.

Defendant consented to the search when asked to do so by Trooper Schaffner. Defendant consented again after studying a form which fully informed him of the scope of the search and of his right to refuse to consent. Defendant consented yet a third time in the presence of Trooper Torres. Further, defendant never withdrew his consent. Therefore, the seizure of the drugs was lawful.

In *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the United States Supreme Court held that the roadside questioning of a motorist detained pursuant to a routine traffic stop does not constitute "custodial interrogation" for purposes of the Miranda rule. The Court found that:

... the usual traffic stop is more analogous to a so-called 'Terry' stop ... than to a formal arrest ... a policeman who lacks probable cause but whose observations lead him reasonably to suspect that a particular person has committed, is committing or is about to commit a crime may detain that person briefly in order to investigate the circumstances that provide suspicion ... Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions ... The similar noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops

are not "in custody" for the purposes of Miranda.

*Berkemer,* at 439–40, 104 S.Ct. at 3150.

◼ Thus, defendant's answers in response to the questions about whose car he was driving and where he was going were lawfully obtained under the *Berkemer* rationale that Miranda rights need not be given in order for an officer to ask a detainee a moderate number of questions to determine his identity. This questioning commenced only after Trooper Schaffner viewed the interior of the vehicle and continued for only a few minutes.

◼ After the cocaine was found, the Troopers did not question defendant until he had been given Miranda warnings verbally and they were assured he understood them. An express waiver of Miranda rights is not necessary. *North Carolina v. Butler,* 441 U.S. 369, 373, 375–76, 99 S.Ct. 1755, 1758–59, 60 L.Ed.2d 286 (1979). In assessing the validity of a waiver of the right to remain silent, the trial court looks at many factors that make up the totality of the circumstances, including education, age, previous experience with the criminal justice system and defendant's overall knowledge and intelligence.

◼ The Court finds a valid waiver, noting that defendant is an intelligent and sophisticated businessman with prior experience in a federal criminal case. He previously had the advice of an attorney regarding his rights. The setting was non-coercive, his medical condition did not impair his judgment or his will. He was under no duress. It is clear that defendant understood his rights for he answered some questions with exculpatory or mitigating answers but refused to answer further when the Troopers wanted to know who else was involved with the cocaine. Other statements he made were spontaneous and were not in response to interrogation. After Miranda warnings, a refusal to answer questions is not a request for counsel and does not mean no further questions may be asked. *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

Defendant arrived at the post within a relatively short time after having waived his rights. When interrogation resumed, defendant was given Miranda warnings. Defendant acknowledged that he understood those rights, then answered some questions but refused to answer others. All of these statements were given by defendant before he asked for an attorney at which point questioning ceased.

### III. Conclusion

The credible testimony of the witnesses at the suppression hearing establish facts which show that 1) Trooper Schaffner made a valid traffic stop of defendant's vehicle; 2) defendant voluntarily consented to a search of the vehicle and its contents; 3) defendant's statements were either not the result of custodial interrogation, or were made after Miranda warnings were properly given and waived or were spontaneous statements not subject to Miranda protections, and 4) the Troopers' conduct comports with the Constitution of the United States of America. Accordingly, defendant's Motion to Suppress is DENIED in its entirety.

IT IS SO ORDERED.