598 A.2d 813

**Barrington Keith MATTHEWS**

v.

**STATE of Maryland.**

**No. 83, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

Dec. 3, 1991.

**490**

Nancy S. Forster, Asst. Public Defender, on the brief, Baltimore, for appellant.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, State's Atty. for Prince George's, Upper Marlboro, on the brief), for appellee.

Submitted before MOYLAN, ROSALYN B. BELL and DAVIS, JJ.

ROSALYN B. BELL, J.

Barrington Keith Matthews was convicted by a jury in the Circuit Court for Prince George's County of possession of marijuana, possession of marijuana with intent to distribute, and possession of drug paraphernalia. He was sentenced to the statutory maximum of five years in prison and fined a total of $2,500. Matthews has appealed, contending that the trial judge erred:

—in admitting into evidence the marijuana and drug paraphernalia discovered by INS agents (1) when they arrested him on suspicion of being an illegal alien, and (2) when they searched his apartment following his arrest; and

—in admitting the testimony of his wife as to allegedly confidential communications, in violation of the spousal privilege statute.

Because we find no error in the trial judge's rulings, we will affirm.

## THE FACTS

On the morning of November 14, 1989, Agents Mullen and Farley of the United States Immigration and Naturalization Service (INS) went to the 16th Avenue area of Hyattsville to investigate an informant's tip that Matthews, a Jamaican national, was in the country illegally. A check of the INS computers revealed no information whatsoever on Matthews.

When they arrived, at about 7:15 a.m., the agents spotted a car containing two persons. The passenger matched the description the agents had of Matthews. The agents approached the car; Agent Farley spoke to the driver, while Agent Mullen spoke to the passenger. The passenger confirmed that he was, in fact, Barrington Matthews, a Jamaican national. When requested by the agents, Matthews could not produce any identification showing his legal pres-

ence in the country.[1] As a result, the agents placed Matthews under arrest on suspicion of being an illegal alien.

Following Matthews's arrest, the agents, acting pursuant to INS procedures, searched Matthews's pockets and found three bags of marijuana, two in the left pocket and one in the right. The agents then handcuffed Matthews and called their Baltimore central office, requesting that Prince George's County police be called to the scene. During the wait, the agents conversed with Matthews. Agent Farley stated that it was a "good possibility" that he and Agent Mullen asked Matthews for permission to search his apartment, that Matthews refused[2] and the agents then "could have" told Matthews that they would simply get a warrant. Some time later, the police arrived and took custody of Matthews.

Rather than obtain a warrant to search Matthews's apartment, Farley and Mullen telephoned and, after a brief conversation with Ms. Matthews, the agents went over to the apartment. When they arrived, the agents told Ms. Matthews that her husband had been arrested, and that they were looking for documentation regarding his immi-

---

**1.** At sentencing, the trial judge noted that Matthews, because he was married to an American citizen, was eligible to become an American citizen. Apparently, however, Matthews never formally applied for citizenship and is therefore considered an illegal alien by the INS.

**2.** Neither Matthews nor his wife testified at the suppression hearing. Had Matthews testified that the agents asked him for consent to search his apartment and that he refused, and had the hearing judge believed him, this might well be a different case. Several states have held that the police may not obtain consent from a cotenant or family member when they know of the defendant's prior refusal to give such consent. *See, e.g., Silva v. State,* 344 So.2d 559, 560–561 (Fla.1977); *People v. Reynolds,* 55 Cal.App.3d 357, 127 Cal.Rptr. 561, 568–569 (1976); *People v. Mortimer,* 46 A.D.2d 275, 361 N.Y.S.2d 955, 958 (1974). Several federal courts of appeal, however, have taken the opposite view. *See, e.g., United States v. Baldwin,* 644 F.2d 381, 383 (5th Cir.1981); *United States v. Hendrix,* 595 F.2d 883, 885 (D.C.Cir. 1979); *United States v. Sumlin,* 567 F.2d 684, 687–688 (6th Cir.1977). The issue appears to be one of first impression in Maryland. Nevertheless, the issue is not presented on this record, and we express no opinion on it. *See* Motion to Suppress, *infra.*

gration status. She then produced a dresser drawer which she stated contained all of his personal papers. When the agents looked in the drawer, they found a Jamaican passport, as well as several bags containing more marijuana. The agents again called Prince George's County police to inform them of the additional marijuana.

Farley and Mullen then asked Ms. Matthews for consent to search the remainder of the apartment for additional immigration documents. According to them, she orally consented. A further search of the entire apartment revealed no additional immigration documents, but not surprisingly, the agents discovered yet more marijuana in the bedroom closet along with a balance scale. Prince George's County police were called, for yet a third time, to inform them of the drugs that had been discovered. After the search was completed, Officer Michael Keller of the Prince George's County police arrived, and he and the two agents then had Ms. Matthews sign a written consent to search the entire apartment.

## THE MOTION TO SUPPRESS

At a pretrial suppression hearing, appellant unsuccessfully sought to have the marijuana and the scale excluded from evidence. At trial, all of the marijuana recovered from both appellant and the search of his apartment, as well as the scale, were admitted into evidence over his objection. Appellant contends that the trial judge's decision to admit the evidence was error. For the reasons set forth below, we do not agree.

### —The Arrest—

■ Appellant first contends that his warrantless arrest by the INS agents was illegal. Under 8 U.S.C.A. § 1357(a)(2) (1991 Supp.), INS agents are authorized to make warrantless arrests where there is "reason to believe" that a person is illegally in the country *and* that the person is likely to flee or escape if a warrant is obtained. Appellant, apparently conceding that the INS agents possessed

probable cause to arrest him, argues that there was no probable cause to believe that he was likely to flee. We see no merit in this contention.

The words "reason to believe" in § 1357(a)(2) have been interpreted as analogous to probable cause. *Lee v. INS,* 590 F.2d 497, 499–500 (3rd Cir.1979). In this case, two factors suggest that the requisite probable cause to believe that appellant was likely to flee were present. First, when the agents spotted appellant, he was in an automobile, which the Court of Appeals has stated creates an "omnipresent exigency." *Doering v. State,* 313 Md. 384, 397, 545 A.2d 1281 (1988). The trial judge explicitly made such a finding here.

Second, at least three federal circuit courts analyzing this issue have found the requisite probable cause where, as here, evidence of an undisputed and clear cut violation of the immigration laws was presented. *Contreras v. United States,* 672 F.2d 307, 308–309 (2d Cir.1982) (per curiam); *United States v. Reyes–Oropesa,* 596 F.2d 399, 400 (9th Cir.1979); *Aguirre v. INS,* 553 F.2d 501, 502 (5th Cir.1977) (per curiam).

We hold that appellant's warrantless arrest by the INS agents was in accordance with the federal statute authorizing such arrests, and was supported by probable cause. The arrest was therefore legal.

—The Search Following the Arrest—

Appellant concedes that, if his arrest was legal, the agents' search of appellant's pockets was a perfectly proper, run-of-the-mill search incident to a lawful arrest:

"A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the

warrant requirement of the Fourth Amendment, but it is also a 'reasonable' search under that Amendment."
*Colvin v. State,* 299 Md. 88, 97–98, 472 A.2d 953, *cert. denied,* 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984), quoting *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 476, 38 L.Ed.2d 427 (1973).

—The Search of Appellant's Apartment—

Appellant next asserts that the search of his apartment was illegal. Because we hold that Ms. Matthews voluntarily consented to the search of appellant's apartment, we do not agree.[3]

Consent of one with actual, *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1975); *Doering,* 313 Md. at 401, 545 A.2d 1281, or apparent, *Illinois v. Rodriguez,* —— U.S. ——, 110 S.Ct. 2793, 2800, 111 L.Ed.2d 148 (1990), authority over the premises sought to be searched is a valid exception to the warrant requirement of the Fourth Amendment. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *Gamble v. State,* 318 Md. 120, 123, 567 A.2d 95 (1989). In order to be valid, the consent must not be the product of coercion, threats or other pressure. *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2047; *Gamble,* 318 Md. at 123, 567 A.2d 95. The burden of proving that the consent was voluntary is on the State. *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 (1980); *Gamble,* 318 Md. at 123, 567 A.2d 95. The voluntariness of a consent to search is determined from the totality of the circumstances. *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2047; *Gamble,* 318 Md. at 123, 567 A.2d 95. Voluntariness is a factual matter. *Schneckloth,* 412 U.S. at

---

**3.** Appellant also asserts several other arguments to support his contention that the search of the apartment was unlawful: the agents' alleged lack of authority to search the apartment, the alleged lack of probable cause, and the allegedly pretextual reasons for searching the apartment. Our disposition of the consent issue, however, moots these contentions.

227, 93 S.Ct. at 2047; *Gamble,* 318 Md. at 123, 567 A.2d 95. An appellate court is obliged to "extend great deference to the fact finding of the suppression hearing judge with respect to determining the credibilities of contradicting witnesses and to weighing and determining first-level facts." *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356 (1990). The reviewing court, however, is obliged to make an "independent constitutional appraisal" of the ultimate conclusion of voluntariness. *Gamble,* 318 Md. at 128, 567 A.2d 95; *Perkins,* 83 Md.App. at 346, 574 A.2d 356.

■ Based on these principles, and after conducting a thorough review of the facts before the trial judge at the suppression hearing, we hold that there was sufficient evidence for the trial judge to conclude that Ms. Matthews voluntarily consented to the search of appellant's apartment. The only witnesses at the suppression hearing were Agents Farley and Mullen, and Officer Keller.[4] Both Farley and Mullen testified that Ms. Matthews admitted them into the apartment. When they informed her that her husband had been arrested, and that they were seeking any documentation he might have on his immigration status, she produced a drawer which contained his Jamaican passport. The agents also found several bags of marijuana in the drawer as well.

The agents then asked Ms. Matthews for consent to search the remainder of the apartment for additional documentation. They testified that she orally consented. There was no evidence to suggest that any threats or coercion was employed. The only evidence which suggests a lack of voluntariness was Farley's testimony that it was a "good possibility" that the agents discussed a search warrant with Ms. Matthews, although he could not remember why. Appellant posits that the only "conceivable reason for discussing a search warrant with Mrs. Matthews [was] to coerce

---

**4.** There is no competing evidence for us to weigh in our constitutional appraisal since neither appellant nor his wife testified during the suppression hearing.

her consent." While this may be true, there was no testimony from either appellant or his wife to substantiate that the agents mentioned a search warrant. Because no other evidence on this record suggests coercion, and because of the ambiguous nature of Farley's testimony, we hold that the trial judge did not err in holding that Ms. Matthews's consent to search the apartment was voluntary.

■ We hold that the search of appellant's apartment was made pursuant to a valid and voluntary consent by his wife, and that the trial judge properly denied appellant's motion to suppress the evidence obtained as a result of that search.[5]

## CONFIDENTIAL COMMUNICATIONS

At trial, Ms. Matthews testified for the prosecution and described the events leading up to the INS agents' discovery of the marijuana, both in the drawer and the closet, as well as the balance scale. The transcript of the trial suggests that this testimony apparently came as a great surprise to appellant; his counsel indicated his belief that Ms. Matthews had invoked her privilege not to testify against her husband.[6]

---

**5.** Appellant also contends that his wife had no authority to consent to a search of his "personal effects" (presumably, the contents of the drawer which Ms. Matthews gave to the INS agents). In support of this proposition, appellant cites several cases from other jurisdictions. All of these cases, however, predate the Supreme Court's holding in *Rodriguez,* 110 S.Ct. at 2800, that a police officer's "reasonable belief" that the consenting party had authority to consent to a search will validate the search, even if it later turns out that the consenting party did not, in fact, have such authority. *Rodriguez,* 110 S.Ct. at 2800. There is no evidence in this record to demonstrate that the agents knew that the drawer was from appellant's dresser, nor was there any testimony as to the true nature of the drawer. As such, therefore, it was reasonable for the INS agents to believe that Ms. Matthews had authority to consent to a search of the drawer. Under *Rodriguez,* this determination is dispositive.

**6.** Maryland Cts. and Jud.Proc.Code Ann. § 9–106 (1974, 1989 Repl. Vol.), states:

On appeal, appellant contends that Ms. Matthews's testimony violates the "confidential communication" privilege set forth in Md.Cts. & Jud.Proc.Code Ann. § 9–105 (1974, 1989 Repl.Vol.):

"One spouse is not competent to disclose any confidential communication between the spouses during their marriage."

Appellant contends that, by revealing the location of the drugs and the balance scale in their apartment, his wife's testimony violated § 9–105. Based on a review of Ms. Matthews's testimony, we do not agree.

 As an initial matter, the State contends that this issue has not been properly preserved for our review. As a general rule, this Court will only review those issues which were raised and decided in the trial court. Rule 8–131(a). When an objection is made with specificity in the trial court, only the specific objection will be reviewed by this Court;

"when an objector sets forth the specific grounds for his objection, although not requested by the court to do so, the objector will be bound by those grounds and will ordinarily be deemed to have waived other grounds not specified."

*Brecker v. State,* 304 Md. 36, 39–40, 497 A.2d 479 (1985). The State argues that appellant at trial focused solely on the voluntariness of Ms. Matthews's testimony, and only on appeal raises the issue of confidential communications. Therefore, the State contends, the only issue decided by the trial court was the voluntariness of Ms. Matthews's testimony, and the confidential communication issue is therefore waived. We do not agree with this contention.

---

"The spouse of a person on trial for a crime may not be compelled to testify as an adverse witness unless the charge involves the abuse of a child under 18."

At trial, appellant objected that Ms. Matthews's testimony was not voluntary. The trial judge determined that her testimony was voluntary and not coerced. This issue has not been raised on appeal and we do not address it.

Prior to Ms. Matthews taking the stand before the jury, appellant objected to her testimony on both confidential communication and voluntariness grounds. Specifically with respect to confidential communications, defense counsel stated:

"I want to state for the record my position regarding confidential communications. My client is not waiving any privilege that he has in having those confidential communications with this witness excluded."

After requesting to approach the bench three times, and being rebuffed each time, defense counsel objected at the very outset of Ms. Matthews's testimony "to this whole line of questioning." The trial judge then gave counsel a *continuing objection* to Ms. Matthews's testimony. Furthermore, defense counsel's initial statement to the trial judge, that his client was not "waiving any privilege" with respect to confidential communications, can only be read to relate to the issue now before us; appellant had no privilege to bar his wife's voluntary testimony. Clearly, the confidential communication issue was brought to the trial judge's attention, and he overruled the objection on a continuing basis. This issue has been preserved for our review.

Turning to the merits of the issue, the confidential communication privilege is

" 'a late offshoot of an ancient tree'; it is clearly separate and distinct from two rules of the common law which preceded it: (1) the marital disqualification which prohibited a spouse from testifying in favor of the other spouse, and (2) the privilege of a husband or wife not to testify to any facts against the other—a privilege justified, in part, by a need to protect marital confidences. Thus, the marital communications privilege was perceived as a rule distinct from the privilege not to testify against a spouse. However, when a trend appeared, in the period from 1840 to 1870, to abolish or restrict these common law marital disqualifications, the present privilege for confidential communications between spouses was enacted, although it existed in principle long before this period."

*Coleman v. State,* 281 Md. 538, 541–542, 380 A.2d 49 (1977), quoting McCormick, *Handbook of the Law of Evidence* § 78; see 8 Wigmore, *Evidence* §§ 2333–2334 (McNaughton rev. 1961).[7] As noted, modern law has eschewed any absolute prohibition on spousal testimony; however, either one or both of the two privileges which Maryland has enacted by statute have continued in most states, primarily by statute.[8] In *Coleman,* 281 Md. at 541, 380 A.2d 49, the Court of Appeals stated the policy reasons for the privilege at issue here:

"The policy reasons underlying the privilege for confidential communications between husband and wife are (1) that the communications originate in confidence, (2) the confidence is essential to the relation, (3) the relation is a proper object of encouragement by the law, and (4) the injury that would inure to it by the disclosure is probably greater than the benefit that would result in the judicial investigation of truth."

*See McCormick on Evidence,* § 86 (3rd ed. 1984) (suggesting that the policy rationale of encouraging marital confidences to promote harmony between husband and wife is "at best doubtful and marginal"). Because the policy rationale of protecting and nurturing the marital relationship has been weakened over the years, and because of the continued desire to prosecute criminal behavior, most modern courts have begun to interpret the confidential commu-

---

7. Wigmore noted that, while the two common law spousal testimony principles existed, there was rarely, if ever, any need for the confidential communication privilege to be invoked or applied. When the two common law principles were abrogated, however, the confidential communication privilege arose, usually by statute, to take their place.

8. *See* 2 Wigmore, *Evidence* § 488 (Chadbourn rev. 1979) (1991 Supp.). Forty-four states, the District of Columbia and Puerto Rico have statutes or rules of evidence which would provide a colorable claim of privilege under the facts in this case. These statutes fall into two categories: the "confidential" or "private" communications privilege similar to § 9–105; and an absolute privilege against adverse testimony by a spouse, usually with enumerated exceptions in certain situations.

nication privilege more narrowly in recent years. *See* Note, "Evidence—Privileged Communications Between Husband and Wife," 41 Tenn.L.R. 943, 949 (1974).

 In Maryland, in order to qualify as privileged under § 9–105, the communication must be confidential; that is, it must be made in reliance on the marital relationship. *Coleman*, 281 Md. at 542, 380 A.2d 49. If the communication is made with the contemplation or expectation that a third party will learn of it, the confidential communication privilege does not apply. *Gutridge v. State*, 236 Md. 514, 516, 204 A.2d 557 (1964). Furthermore, Maryland is in the minority of states in that the Court of Appeals has taken a narrow view of the term "communication" in defining the privilege. *Gutridge*, 236 Md. at 516–517, 204 A.2d 557.[9] *See also* 8 Wigmore, *Evidence* § 2337 (McNaughton rev. 1961) (attempting to make a distinction between wholly noncommunicative acts, which are not protected by the privilege, and communicative acts accompanied by verbal communication, which are protected).[10]

 In this case, appellant contends that, by revealing the location of the drugs in the drawer and the closet of his apartment, his wife revealed "confidential communications"

---

**9.** *See* McLain, *Maryland Evidence* § 505.2 (1987). In construing *Gutridge*, McLain states:

"The Court of Appeals has held that, generally, nonverbal acts committed in the presence of a spouse, even if in reliance on the other's loyalty, are not protected by this privilege. Only verbal communications or assertive nonverbal acts, such as nodding to indicate an affirmative or negative response, which are intended as communications, may be protected."

McLain's analysis of the *Gutridge* holding does not square with our reading of the opinion, which, in our view, is simply a decision on the facts presented in that case. None of the broad principles enunciated by McLain can be found in the two or three sentences which address the "communication" issue. Furthermore, *Gutridge* has never been cited in support of the general proposition stated by McLain. Because of our disposition of this case, however, we need not address the applicability or extent of the *Gutridge* holding. ·

**10.** Wigmore's analysis has been criticized as unduly restrictive and difficult to apply in practice. *See* 34 Minn.L.R. 257 (1950); 36 Iowa L.R. 154 (1950); 35 Cornell L.Q. 187 (1949).

without his consent in violation of the statute. He posits that the fact of placing drugs in a drawer and a closet is a "communication." The State, on the other hand, seeks to analogize such actions to dropping keys in another person's pocket, the facts of *Gutridge*. What both sides have clearly overlooked here is the most basic component of the privilege: a communication of any kind, however basic or rudimentary.

Ms. Matthews repeatedly testified that she did not know that there were drugs in either the drawer or the closet. As such, there is no evidence that demonstrates that she was present when the drugs were stored, or even that she knew that her husband had put them there. While appellant posits that this assertion by Ms. Matthews is refuted by the fact that the drugs in the closet were in plain view, granting the validity of this contention does not prove the point. Strict construction of the privilege statute mandates that we hold that there is insufficient evidence on this record to suggest that Ms. Matthews's testimony or consent to allow the INS agents to search appellant's apartment violated the confidential communication privilege set forth in § 9–105.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.