962 A.2d 393

**James Desmond JONES**

v.

**STATE of Maryland.**

No. 37, Sept. Term, 2008.

Court of Appeals of Maryland.

Dec. 23, 2008.

Nancy S. Forster, Public Defender, Baltimore, for petitioner.

Brenda Gruss, Assistant Attorney General (Douglas F. Gansler, Attorney General of Maryland, on the brief), Baltimore, for respondent.

Argued before: BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, JOHN C. ELDRIDGE, (Retired, specially assigned) and IRMA S. RAKER, (Retired, specially assigned) JJ.

RAKER, J.

In this murder case, we must decide whether the Circuit Court for Anne Arundel County erred in denying petitioner's motion to suppress evidence seized by the police. The Court of Special Appeals affirmed the trial court, holding that the "No Trespassing" sign on petitioner's property did not lead to a reasonable expectation that the sign would prevent police officers from walking to the front door in furtherance of an investigation. We shall affirm.

I.

Petitioner James Desmond Jones was indicted by the Grand Jury for Anne Arundel County in a multi-count indictment, charging murder in the first degree, conspiracy to commit murder, use of a handgun in a felony and use of a handgun in the commission of a crime of violence. Following a bench trial, he was convicted of second degree murder and use of a handgun in the commission of a crime of violence. The court sentenced him to a term of incarceration of twenty five years on the murder charge and twenty years on the handgun charge, to be served concurrently. The court recommended that petitioner serve his sentence at Patuxent Institution.

Prior to trial, petitioner filed an "Omnibus Motion pursuant to Rule 4–252" which included a motion to suppress all physical evidence the police seized from 11299 Station Road, Worton, Maryland on January 25, 2006, when they went there to investigate the murder of Darnell Brown. Petitioner's argument at the motion hearing was that when the police entered on to his property, they were trespassers and hence, the

search of the vehicle was illegal, as was everything that flowed from it.

The following facts are derived from the hearing on the motion to suppress. Detective William Johns, a twenty-four year veteran police officer, and Detective John Lee investigated the murder of Darnell Brown on January 13, 2006. Detective Johns found a cell phone on Brown's body, and after checking incoming calls to that phone, he learned that several calls had been made shortly before Brown's death from the same phone number. Detective Johns testified as follows:

"Well the first thing that struck us was that the last phone call placed to or from the victim before his death was from that number. Looking further we found that there are multiple calls back and forth between the victim and that phone number shortly before his death."

The police determined that the owner of the cell phone number was Tammy Jones, petitioner's wife, and they obtained her address. On January 25, 2006, in the afternoon when it was still daylight, Detectives Lee, Johns and three other law enforcement officers went to the address listed to the cell phone, 11299 Station Road, Worton, Maryland. Four of the officers, including Detectives Lee and Johns, were in plainclothes, while Kent County Deputy Hickman was in uniform.

Detective Johns described what he saw when they arrived at the property. He noticed several buildings on the premises, some houses and travel trailers. He observed a driveway and a split in the road, the left fork that ended at the home of Mary (Elizabeth as she is known) and Carl Web, the parents of Tammy Jones, and to the right, the home of petitioner and his wife. A six foot privacy fence between the Webs' and Joneses' houses divided the property in two. Mailboxes for the Webs and Joneses were located at the split in the driveway. Petitioner testified that people came once a day to make deliveries for his mail order business. In addition, about thirty feet off the road and posted on a cedar tree was a sign that said "No Trespassing, Hunting or Fishing." In smaller

letters, the sign said, "Violators prosecuted under penalty of law." At the bottom of the sign, Carl and Elizabeth Web had signed their names with a magic marker. The sign was shaded by overhanging branches, and Detectives Johns and Lee both testified that they did not see the sign.

Detectives Johns and Lee went up to the Webs' house, where they talked to Mrs. Web, Tammy Jones's mother. She told them that the Joneses lived in the other house and that the phone number the police had found belonged to her daughter, Mrs. Jones. Mrs. Web also expressed concern that her daughter had not returned a car that Mrs. Web had rented, and for which she was still paying.

After a short visit with Mrs. Web, and after seeing Mrs. Jones outside her house briefly, the detectives went over to the Joneses' house to speak with Mrs. Jones. Detectives Johns and Lee went up to the front door and knocked persistently for approximately five minutes. Mrs. Jones answered the door, stepped outside and quickly shut the door behind her. Detective Johns asked if there was some place they could talk because it was cold outside. Detective Johns described the initial encounter as follows:

"She stepped outside and shut the door behind her. It was a rather cold day and I told her we needed to talk to her and asked her if we could step inside. Instead she said that she would rather us to step out to one of the—they had two large metal shop buildings in their yard and she asked me to step out to one of those, which we did."

Mrs. Jones led them into one of the warehouses on the property that was used for the Internet sales business she and petitioner operated and that specialized in selling skateboards, snow boards and clothing. Once inside, Detective Johns explained why they were there and asked her some questions about the homicide. According to Detective Lee, Mrs. Jones behaved in a friendly manner and was very willing to talk to them. Detective Johns asked about the rental car Mrs. Web had mentioned, and Mrs. Jones said it was in the building next door. He asked if he could go look at it, and Mrs. Jones said

yes, but that she had to go get the key. She left for about ten minutes and returned with the key to the building, and then she led the detectives into a third building on the property where the car was located.[1] Detective Johns asked Mrs. Jones for permission to look inside the car, and she agreed but needed to get the keys, so she left again for about ten minutes to retrieve them. When she came back with the car keys, she gave them to Detective Johns, who opened the car and looked inside briefly. He saw a stain on the back seat that appeared to be blood, along with a hole in the seat that appeared to be from a bullet.

After Mrs. Jones brought the key to the car and told the detectives they could look inside, the detectives agreed to Mrs. Jones's request for her to go back in the house. Both Detectives Johns and Lee testified that throughout the encounter, Mrs. Jones never exhibited any reluctance to speak or interact with them and never asked any of them to leave. The officers called a tow truck service to take the car to the police station. As they were waiting for the tow service to arrive, Detectives Lee and Johns walked back to the front door, knocked on it and Mrs. Jones answered. Mrs. Jones came outside with a bag containing several cell phones, one of which was the cell phone that had placed and received calls from the victim, Darnell Brown. Mrs. Jones agreed to the detectives' request to examine the contents of the cell phone's memory. Shortly thereafter, the detectives took Mrs. Jones to the Kent County Sheriff's Office. The car was transported to the Annapolis Fire Department where, later that same day, the detectives obtained a search warrant, and they searched the car. On February 3, 2006, the detectives executed search warrants for the property at 11299 Station Road and for saliva samples of Mrs. Jones and petitioner.

In a model, detailed, opinion resolving the motion to suppress, the trial judge set forth specific findings of fact, re-

---

1. The building is described in the record as a warehouse, barn, barn closet, shed, shop and building. For clarity, we refer to this building as a warehouse.

solved conflicts in the testimony, and set out conclusions of law. There was a discrepancy in the testimony as to the number of "No Trespassing" signs that were actually posted on the property at the time of the police entry. The court found, contrary to petitioner's testimony that there were many signs posted, that there was only *one* sign posted when the police went on the property and that all the signs except the one posted on the cedar tree, "appeared pretty crisp and new," and had been put up after the fact. The court reasoned as follows:

"So I would find as a fact the evidence persuades me that the only sign that was there when the police came to the property was this large sign on the—what appears to be a large cedar tree that according to the testimony was set back 30 feet from the driveway, from the gravel driveway.

"And that that sign, which in the photos that we have is shaded by overhanging branches, was a sign which might have been overlooked by someone coming up the driveway in a normal fashion.

"But even if it had not been overlooked what the sign says is 'No Trespassing, hunting or fishing' all of those in larger letters. And in smaller letters 'Violators prosecuted under penalty of law.'

"The inclusion of the words 'hunting and fishing' and the fact that the sign is placed back from the road in the middle of a field is significant to the Court as to the expectations of the owners of the property and the significance they intended that sign to have.

\* \* \*

"In this case the evidence as to the placement of that sign is that again it is a sign which is out in the field and includes reference to hunting or fishing, so that one might reasonably infer that that was the primary intent of it, to keep people from going out in the fields.

"And secondly, the evidence is that there were mailboxes which were up the driveway. And that a mailman regularly would go to the same area that the police had gone.

"And Mr. Jones, the Defendant himself, acknowledged that everyday delivery people from Fed–X, or UPS, or one of those services made deliveries and I guess pickups because they were running a retail and wholesale business out of the sheds, so they were shipping things out.

"They were receiving deliveries and they were shipping things out. They were receiving mail. I would assume that there was electricity and heating in these homes, so they were probably also receiving either electricity—I mean either heating oil deliveries or people coming to read the electric meters.

"And I would assume that, like most people, they would not have discouraged that. If there was smoke coming from their house I think fire trucks would have come. If there was a crime that the police thought should be investigated, then like the fire department, they might come.

\* \* \*

"And I think under all of the circumstances that it was not a violation of the reasonable expectations of privacy for them to come up the driveway in the first place and to go knock on the first door that they came to.

"Because the testimony we have heard was that she is the co-owner of the whole property and she is also a participant in the business with Mr. Jones.

"So that if she wants to invite them into the shop where the business takes place, she has as much right to do that as Mr. Jones would have to forbid them.

\* \* \*

"So I think the evidence is very clear that it had become a consent search. And once they were invited with consent into the sheds and saw the rental car, I think . . . that in order to preserve the evidence that they would have the

right to tow it, and to preserve it, and get a search warrant before going further if there were containers within the vehicle that might not be accessible.

"And they got that search warrant, so there is not a question once they saw the car the rest of it flows from the facts that we have heard, that the police did only what they had a right to do."

The trial court denied the motion to suppress. The court found that Mrs. Jones consented voluntarily to the search of the car and that because Mr. Jones was a resident at the house with his spouse, Mrs. Jones, she could lawfully consent to search the property when petitioner was not present.

Following a bench trial, the court found petitioner guilty. Petitioner noted a timely appeal to the Court of Special Appeals, which affirmed the Circuit Court. *Jones v. State*, 178 Md.App. 454, 943 A.2d 1 (2008). The intermediate appellate court held that, despite the "No Trespassing" sign posted on the cedar tree, petitioner did not have a reasonable expectation of privacy with respect to his yard and door, and that petitioner's wife voluntarily consented to the search.

We granted Jones petition for writ of certiorari to consider the following question:

(1) Did the police violate the Fourth Amendment and Article 26 when they trespassed upon private property clearly marked with "No trespassing" signs and surrounded by a six foot high privacy fence, knocked "persistently" on the residence door for five minutes, in order to conduct a "knock and talk"?

(2) Was the search of the property the product of an involuntary consent?

*Jones v. State*, 405 Md. 290, 950 A.2d 828 (2008).

## II.

When this Court reviews the Circuit Court's denial of a motion to suppress, ordinarily our review is limited to the evidence presented at the suppression hearing. *See Owens v. State*, 399 Md. 388, 403, 924 A.2d 1072, 1080 (2007) (citing

*State v. Rucker*, 374 Md. 199, 207, 821 A.2d 439, 443–44 (2003)). We give deference to the trial court's factual findings, upholding them unless they are clearly erroneous. *Id.* We consider the evidence and all inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion. *Id.* Nonetheless, we make an independent constitutional evaluation, by "reviewing the relevant law and applying it to the facts and circumstances of the individual case." *Id.*

■ We turn to the first question presented in the certiorari petition and at the outset point out that the question as presented assumes the truth of certain facts contrary to the finding of the Circuit Court. The question presented in the certiorari petition states that the police *trespassed* onto property that was *clearly marked* with "No Trespassing" signs. The Circuit Court found, however, as a fact, that petitioner's property was *not* clearly marked "No Trespassing," and that there was only *one* posted sign, covered by hanging tree limbs. The court also concluded that the police officers were not trespassers and the initial entry by the police officers onto the property was lawful.

The Court of Special Appeals affirmed, holding that the police officers were not trespassers and concluding that police officers on legitimate business, by merely approaching a dwelling to ask questions, do not commit an unlawful search or seizure of property or an unlawful seizure of a person. *Jones, supra,* 178 Md.App. at 472, 943 A.2d at 11. The intermediate appellate court reasoned as follows:

"For Fourth Amendment purposes, appellant could not have had a reasonable expectation that the 'No Trespassing' sign would or should prevent visitors with a legitimate purpose from walking to the front door, including police officers in furtherance of an investigation. The Supreme Court has held (1) that the threshold of a home is not a protected area when voluntarily exposed, [*United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) ], and (2) open land not otherwise subject to a reasonable expectation of

privacy is not made so by the presence of a no trespassing sign, even if the investigating officer sees it. *Oliver v. United States,* [466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) ]."

*Id.* at 473–74, 943 A.2d at 12. Applying the reasoning of the Supreme Court cases, the court concluded that "[i]n the case before us, the front of the house and the door were exposed to the public, and appellant had no reasonable expectation of privacy with respect to entry of the yard and a knock on the door by investigating officers." *Id.* at 472, 943 A.2d at 11. We agree.

Petitioner next invokes our "knock and talk" jurisprudence, *see Scott v. State,* 366 Md. 121, 782 A.2d 862 (2001), and *Brown v. State,* 378 Md. 355, 835 A.2d 1208 (2003), arguing that the officers knocked persistently on the front door of his home in order to conduct a "knock and talk," and that we should overrule our recent cases blessing this police procedure and find the search and ensuing seizures unlawful. We decline to do so, for several reasons.[2]

■ Although not a new phenomenon, *see Davis v. United States,* 327 F.2d 301 (9th Cir.1964), the procedure known today as "knock and talk" and commonly utilized by some police officers, has become a fashionable alternative to procuring a search warrant when police officers do not have probable cause to obtain a search warrant. Instead, several officers approach a home, knock on the door, and request consent to

---

2. Petitioner further contends that the detectives' search was unlawful under Article 26 of the Maryland Declaration of Rights. Though the language of Article 26 is not identical to the language of the Fourth Amendment to the United States Constitution, we have construed Article 26 as being *in pari materia* with the Fourth Amendment and have accepted as persuasive the Supreme Court's construction of the Fourth Amendment. *See Scott, supra,* 366 Md. at 139 n. 2, 782 A.2d at 873 n. 2; *Gadson v. State,* 341 Md. 1, 668 A.2d 22 (1995), *cert. denied* 517 U.S. 1203, 116 S.Ct. 1704, 134 L.Ed.2d 803 (1996); *Gahan v. State,* 290 Md. 310, 430 A.2d 49 (1981). Our conclusion that petitioner's Fourth Amendment rights were not violated during the detectives' investigation and subsequent search and seizure of the rental car, applies equally to petitioner's Article 26 claim.

enter and to search the house.[3] If the person consents, the search usually proceeds, and often, what is found or observed by the officers forms the basis for a search warrant leading to the seizure of contraband or evidence.

What is significant about the "knock and talk" procedure thus far in its development is that its application has been limited generally to a dwelling house. The concern for privacy and protection of one's home is the core value which has given rise to the significant litigation in this area. *See, e.g., State v. Ferrier,* 136 Wash.2d 103, 960 P.2d 927, 931 (1998) ("Especially evident is the fact that in no area is a citizen more entitled to his privacy than in his or her own home. For this reason, the closer officers come to intrusion into a dwelling the greater the constitutional protection."). We defined the police procedure known as "knock and talk" in *Scott* as follows:

> "[P]olice officers, lacking a warrant or other legal justification for entering or searching a *dwelling place,* approach the dwelling, knock on the door, identify themselves as law enforcement officers, request entry in order to ask questions concerning unlawful activity in the area, and, upon entry, eventually ask permission to search the premises. Permission is often given, and, if the police then find contraband or other evidence of illegal activity, the issue is raised of whether the procedure has in some way contravened the occupant's Fourth Amendment rights."

*Scott, supra,* 366 Md. at 129, 782 A.2d at 867 (emphasis added).

Jones argues "knock and talk" for the first time on appeal before this Court. Before the Circuit Court, neither petitioner nor the State uttered the phrase. The trial court raised "knock and talk" briefly in its discussion of the police investi-

---

**3.** A motel room, considered a temporary dwelling, is afforded the same protection under the Fourth Amendment as a dwelling home. *See Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964) (stating "[n]o less than a tenant of a house, or the occupant of a room in a boarding house, a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizure").

gation of the cell phone when it remarked that it was not a search that the police were seeking when they went to the Joneses' property but, rather, "it was a knock and talk, an inquiry as they might inquire of any citizen." The issue was not raised in briefs before the Court of Special Appeals. The so-called "knock and talk" rule first arose in any significant way for the first time in this case as *dicta* in the intermediate appellate court's discussion of why police officers who, on legitimate business, approach a dwelling to ask questions do not commit an unlawful search or seizure of property and are not trespassers. *Jones, supra,* 178 Md.App. at 472–73, 943 A.2d at 11–12. Other than asking this Court to reconsider *Scott* and *Brown* and to overrule those cases because petitioner considers them wrongly decided, petitioner has not offered any new reasons or grounds to suggest that the police officers did anything wrong under prevailing "knock and talk" jurisprudence.

▮▮▮▮ Petitioner's attempt to paint this case as a "knock and talk" case fails for another reason. This case does not fit within our definition of "knock and talk." The police officers did not enter the dwelling house and search the house. It is clear that the protections of the Fourth Amendment do not come into play for a "knock and talk" until there is a search. *See Young v. City of Radcliff,* 561 F.Supp.2d 767, 783 (W.D.Ky.2008) (noting that "Fourth Amendment protections hinge on the occurrence of a search"). The officers merely knocked on the front door, and when Mrs. Jones came outside, she took them to another building on the property. There was no search or seizure in the home flowing from the knocking on the door of petitioner's residence. The entry of the police in this case was into a warehouse or shed (albeit located on the same property as the dwelling) used by petitioner for commercial purposes; the police never entered nor searched a dwelling house. In fact, after petitioner's wife refused the police admittance into the home, she invited them into the warehouse to talk. These facts alone are sufficient to take the case out of the "knock and talk" procedure, and we therefore decline to reconsider *Scott* and *Brown.*

## III.

We turn next to the question of whether Mrs. Jones's consent was involuntary. The trial court found that Mrs. Jones, as a co-owner of the property, as well as a business participant with her husband, had the right to consent to the search of the warehouse and the car. As for the "persistent knocking," the trial court found it was not unreasonable for the officers to continue knocking on the door, after they had been told by Mrs. Jones's mother that her daughter was at home and after seeing Mrs. Jones outside her house earlier. The court postulated that the officers could have reasonably believed that Mrs. Jones might have been in the bathroom or shower, been in the middle of an important phone call, or any other explanation for her taking several minutes to answer the door. When she did answer the door, her demeanor was described by the officers as friendly and cooperative. The court concluded that her consent was voluntary. The Court of Special Appeals agreed, holding that under the totality of the circumstances, Mrs. Jones freely and voluntarily consented to the search. *Jones, supra,* 178 Md.App. at 475–76, 943 A.2d at 13.

Before this Court, petitioner argues that the interactions between Mrs. Jones and the police were not consensual. He maintains that Mrs. Jones was seized by the police because the police conducted the "knock and talk" in such a coercive manner as to result in a seizure when she finally answered the door and submitted to their authority. The State responds that petitioner has no standing to contest any purported seizure of his wife, and in any case, she was not seized, and her consent to search the property was voluntary.

Even if Mrs. Jones had been seized by the police when they knocked on her door, (a proposition which we do not accept), petitioner is not entitled to have any evidence suppressed as a result. Fourth Amendment rights are personal in nature and may only be enforced by the person whose rights were infringed upon. *See Rakas v. Illinois,* 439 U.S. 128, 138, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978); *State v.*

*Savage,* 170 Md.App. 149, 174–76, 906 A.2d 1054, 1068–69 (2006). A defendant may not vindicate vicariously the Fourth Amendment rights of someone else. *See Simmons v. United States,* 390 U.S. 377, 389, 88 S.Ct. 967, 974, 19 L.Ed.2d 1247 (1968) ("[R]ights assured by the Fourth Amendment are personal rights, and they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure").[4] Nonetheless, whether Mrs. Jones had been seized by the police before she consented to the search of the property is a factor to be considered under the totality of the circumstances in assessing whether her consent was freely and voluntarily given.

---

**4.** At the motions hearing, the State raised petitioner's lack of standing to contest the police presence on petitioner's driveway or any seizure of Mrs. Jones. The Circuit Court found that petitioner had standing. Petitioner testified and responded to the State's questions related to the standing issue. He testified as follows:

"[STATE]: You don't own that property, do you?

"[PETITIONER]: My wife and I own it and her parents have the right to live there until they die.

"[STATE]: You own that property?

"[PETITIONER]: Well in my wife's name.

"[STATE]: So your wife owns the property? You do not own the property, correct?

"[PETITIONER]: Correct."

The Circuit Court found the following with respect to petitioner's ownership in the property:

"The evidence indicates that he was a resident at the house with his spouse, Ms. Jones. And that at the time that Ms. Jones was a co-owner of some variety. I am not sure if it was a joint tenancy, or tenants in common, or what it was. So at the very least it would have been what in legal technicality we might have called tenancy at will, that he had permission to live there with his spouse, and it could have been more than that."

The record is unclear as to what interest, if any, petitioner had in the property. The problem for this Court in addressing the standing issue is that the search in this case took place in a warehouse on petitioner's property, and the seizure of an automobile parked therein. The automobile was rented by Mrs. Jones's mother, who gave specific instructions that petitioner was not to drive the car. The standing issue related to the search of the warehouse and the search and seizure of the rental automobile has never been raised, argued or briefed in any court. Accordingly, in light of our holding affirming the judgment of the Circuit Court, we do not address the issue of petitioner's standing to contest the police search of the automobile.

 We begin our analysis with the recognition that the Fourth Amendment to the United States Constitution and Article 26 of the Maryland Declaration of Rights preclude unreasonable searches and seizures. With few limited exceptions, the Fourth Amendment prohibits a warrantless entry into a person's home. A warrantless search and seizure is *per se* unreasonable unless it falls within one of the recognized exceptions to the warrant requirement. A search conducted pursuant to valid consent, *i.e*, voluntary and with actual or apparent authority to do so, is a recognized exception to the warrant requirement. *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). In *Matlock*, the United States Supreme Court discussed third-party consent, stating as follows:

> "The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."

*Matlock, supra*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7.

 A spouse may consent to the search of jointly owned property. *See Bellam v. State*, 233 Md. 368, 370, 196 A.2d 891, 892 (1964); *Matthews v. State*, 89 Md.App. 488, 496–97, 598 A.2d 813, 817 (1991); *see also*, George L. Blum, Annotation, *Admissibility of Evidence Discovered in Search of Defendant's Property or Residence Authorized by Defendant's Spouse (Resident or Nonresident) in State Cases*, 65 A.L.R.5th 407 (1999). When the State alleges that the basis of the search or seizure is consent, the burden is on the State to prove that the consent was freely and voluntarily given. *United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 (1980); *Abeokuto v. State*, 391 Md. 289, 334, 893 A.2d 1018, 1044 (2006); *Matthews, supra*, 89

Md.App. at 496, 598 A.2d at 817. The determination of whether consent is valid is a question of fact, to be decided based upon a consideration of the totality of the circumstances. *Schneckloth, supra,* 412 U.S. at 227, 93 S.Ct. at 2047–48 (stating "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances").

We agree with the Circuit Court and the Court of Special Appeals in their conclusion that under the totality of the circumstances, Mrs. Jones's consent was freely and voluntarily given. First, we find that she was not seized by the police. As we said in *Scott, supra,* 366 Md. at 132, 782 A.2d at 869, that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions. . . ." A seizure occurs when a person is restrained by the police and the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen. *Id.*

Petitioner argues that the police officers' "persistent" knocking on the door made this a "knock and talk" case and constituted an unlawful seizure. The Supreme Court of Kentucky discussed police knocking on a door in the context of knock and talk, noting as follows:

> "An officer's belief that someone is home and simply not answering the door does not change this analysis. The crux of the validity of the knock and talk procedure is that it is a consensual encounter in a place where the officer, like the public, has a right to be. Just as no resident is required to answer his door or respond to questions when the general public comes calling, so it is with a police officer, regardless of whether the failure to answer the door is intentional or the result of the resident's inability to hear the knock. Moreover, as any member of the public can be told and required to leave the premises, so can an officer."

*Quintana v. Commonwealth,* 276 S.W.3d 753, 759 (Ky.2008). The police knocking, even if it persisted from three to five minutes, did not constitute a seizure of Mrs. Jones. When she

opened the door, the officers reported that she was friendly and cooperative. She felt sufficiently confident and free to refuse the officers entry into the home and instead, spoke with the officers at the door and then brought them to the warehouse where they could continue to talk. Furthermore, nothing in either the detectives' or Mrs. Jones's behavior suggests that Mrs. Jones was forced to open the door or that she lacked the freedom to continue ignoring the detectives' knocking. On two occasions while they were in the warehouse, Mrs. Jones left the detectives, for approximately ten minutes, and returned with keys from her house, including the set of keys that unlocked the door to the second warehouse. Because Mrs. Jones voluntarily consented to the detectives' search of the car in the second warehouse, and she had a legal right to do so, the search of the premises without a warrant did not infringe upon petitioner's Fourth Amendment rights or his rights under Article 26 of the Maryland Declaration of Rights.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.*

Chief Judge BELL and Judge ELDRIDGE join the judgment only.