967 A.2d 210

**Maurice Lewis FORD**

v.

**STATE of Maryland.**

**No. 2912, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

March 9, 2009.

536

Sara F. Teich (Williams & Connolly, LLP on the brief), Washington, DC, for Appellant.

Brian S. Kleinbord (Douglas F. Gansler, Atty. General on the brief), Baltimore, for Appellee.

Panel: SALMON, MEREDITH, ZARNOCH, JJ.

SALMON, Judge.

Maurice Ford was convicted by a jury in the Circuit Court for Baltimore County of possession of heroin with intent to distribute and possession of that substance. The jury acquitted Ford of illegal possession of a registered firearm. After

sentencing, Ford filed this appeal in which he makes two major arguments:

(1) That the motions judge erred when he ruled that he (Ford) did not have standing to contest a warrantless search of a Chevrolet Cavalier automobile that he drove regularly;

(2) That the motions judge erred when he denied a motion to suppress evidence seized from appellant's home by police officers who entered the home without first knocking or announcing.

## I

Ford does not contest the sufficiency of the evidence produced by the State to convict him. Nor does he contend that the trial judge committed any error. According to appellant, the motions judge alone erred. As a consequence, only a brief outline of the background facts is necessary.

Ford lived at 2212 Firethorn Road in Baltimore County with his fiancé, Althea Fisher, at all times here relevant. Ms. Fisher's four children also live at that address. The Baltimore County police received an anonymous tip in February 2007 advising that drug related activities were taking place at 2212 Firethorn Road. As a result of that tip, the police began surveillance of the house and its occupants. Police officers also began retrieving and inspecting garbage from the house "at the place of normal [trash] collection." As a result of three of these trash inspections, the police retrieved a total of thirty-four empty gel capsules containing heroin powder residue; also recovered from the trash were marijuana stems.

Two detectives, who were members of the Baltimore County Police Department, applied for a search and seizure warrant for Ford's house. The application for the warrant detailed what had been seized during the trash inspections and set forth Ford's past criminal arrest history, which dated back to 1989. According to the application, Ford's criminal history included two convictions for drug-related crimes and numerous charges that had been *nolle prossed* by the prosecuting

authorities. The application requested that the judge issue a "no knock" warrant based on the risk to police officers that (purportedly) existed because of: 1) a check of Ford's background that revealed he had prior "guns or weapon charges" filed against him and 2) "training, knowledge and experience . . . [leading the officers who applied for the warrant to believe] that drug dealers commonly have in their possession, on their persons, in their cars, or in their residence's firearms. . . ."

A "no knock" search warrant was issued on May 23, 2007, by a District Court judge. In addition to allowing the police officers to enter the home without knocking, the warrant permitted the police officers to search the property located at 2212 Firethorn Road as well as Ms. Fisher and Ford. The warrant did not permit the search of any automobile owned or operated by Ford or Ms. Fisher.

On June 6, 2007, at approximately 8:56 p.m., the "no knock" warrant was executed by members of the Baltimore County Police Department. Once inside the house, the officers located Ford in the living room and secured him. Detective Glenn Wagner then asked Ford if there were any drugs in the house. Ford responded in the negative. Disbelieving that answer, the officers began to search the house. Detective Frank Masson recovered baggies and empty gel capsules with white powder residue from the pocket of a leather jacket hanging inside a basement closet. Detective Wagner also searched a closet on the main floor of the residence and found, in the pocket of a coat, 43 gel caps filled with white powder that was later determined to be heroin.

Officer Jeff Newell went outside the house to search a Chevrolet Cavalier that the police had seen Ford driving before the search commenced. When, in relation to the recovery of the drugs from the house, the search of the car commenced is not shown in the trial record or the record in the suppression court.

Officer Newell searched the passenger compartment of the Chevrolet Cavalier and found no incriminating evidence. He

next opened the trunk, where he found a beige coat. In the pocket of that coat, Officer Newell found a small digital scale and a loaded 25 caliber handgun.

## II

Ford filed pre-trial motions to suppress several items of evidence. Only two of those motions are here relevant. One motion was to suppress the evidence recovered as a result of the search of the Chevrolet Cavalier. Another motion sought to suppress the evidence seized from Ford's home on the grounds that the police entered that home without first knocking or otherwise announcing their presence.

### A. The Search of the Chevrolet Cavalier

At the outset of the suppression hearing, the prosecutor announced that he did not concede that appellant had standing to challenge the search by Baltimore County police officers of the Chevrolet Cavalier. The State and Ford then stipulated: 1) that the vehicle searched was titled in the name of Althea Fisher, and 2) that Ford was seen, shortly before the execution of the search warrant, parking the Chevrolet Cavalier.

Ford testified at the suppression hearing that he and Ms. Fisher had "been together" for seven years and that she was the mother of his two-year old child. In 2001, while Ford was in prison, Ms. Fisher purchased the 2001 Chevrolet Cavalier that was later searched by the police. Ford started driving the Cavalier after he got out of prison in 2002. In his words, he drove "the car all the time." Ms. Fisher also drove the car but Ford drove it more than she did. To Ford's knowledge, no one else drove the Chevrolet Cavalier.

While living together from 2002 until the time of his arrest on June 6, 2007, Ford and Ms. Fisher pooled monies from their paychecks in order to pay expenses. The bills that were paid out of that pool of money included car payments on the Chevrolet Cavalier.

In 2006, Ms. Fisher purchased a Dodge van. Thereafter, Ford continued to regularly drive the Cavalier while Ms.

Fisher usually drove the van. On cross-examination, the prosecutor asked Ford if he considered the Chevrolet Cavalier to be his car. Ford answered: "I can't consider it my car because it's not mine."

Ms. Fisher left the house driving the Dodge Caravan on the date the search warrant was executed. She was arrested by the police not long after she left. Prior to leaving, the van had been parked in front of the house. In order to save the parking spot for his fiancé, Ford got in the Cavalier and drove it from the rear of the residence to the front and parked it where Ms. Fisher's van had been parked. The search of Ford's house took place within one hour thereafter.

The motions judge ruled that Ford did not have standing to challenge the search of the Chevrolet Cavalier because the car belonged to Ms. Fisher. According to the motions judge, although Ford had an "expectation of privacy" while driving the automobile with Ms. Fisher's permission, he did not have such an expectation when he was not driving because Ms. Fisher could say to any third party that he or she also had permission to drive the car.

### B. The "No Knock" Entry

At the hearing to suppress the evidence seized from Ford's home, no witnesses testified. The prosecutor and defense attorneys agreed, in response to the motions judge's questions, that the police entered Ford's home without knocking or otherwise giving Ford any notice that they were about to enter.

The court admitted into evidence, as State's exhibit No. 1, the search and seizure warrant that allowed the police to search the premises. Also admitted was the application for the warrant, which was signed by Detective Wagner and his colleague, Detective H.L. Ellingson. In the application for the search warrant, the detectives stated that the police had received an anonymous tip in February 2007, advising that "heroin is being used and sold" at 2212 Firethorn Road. The application also said that heroin and marijuana residue had

been found through inspections of the trash at Ford's home. It also spelled out, in detail, Ford's criminal record.

According to the application for the warrant, appellant had been arrested fourteen times between June 4, 1989, and April 22, 2004. In Baltimore City he had been convicted of felony theft (10/11/91); unlawful manufacturing of controlled dangerous substances (10/8/97); felony theft (9/14/98); and unlawful possession of a controlled dangerous substance. In Baltimore County, he had been convicted of unauthorized use of an automobile in September 19, 1991. Furthermore, he had been arrested for numerous other charges, such as third-degree burglary, second-degree assault, carrying a deadly weapon with the intent to injure, and possession of controlled dangerous substances with intent to distribute. All of the last mentioned charges were *nolle prossed* or otherwise dismissed prior to trial. In the application for the search warrant, the affiants also said "that guns and violence are commonly associated with narcotics and narcotic dealers . . . ." and that "[d]ue to the background check and information reflecting criminal involvement pertaining to guns or weapons charges [against] . . . [Ford], your affiants request that a 'No Knock' Search and Seizure Warrant be issued for officer safety purposes."

At the suppression hearing, defense counsel acknowledged that one of the reasons that often justify the issuance of a "no knock" warrant is concern about the safety of the police officers who are called upon to execute the search warrant. Movant's counsel contended, however, that the writers of the application for the warrant assumed, without any basis, that "somebody who was involved with drugs, possesses a gun." Counsel also argued that Ford's past criminal history, as set forth in the application for the warrant, did not show that Ford was "in any way violent or presented any sort of danger to the police officers."[1] The prosecutor countered by arguing

---

1. Ford's counsel acknowledged at the suppression hearing that his client had been *charged* in 2004 with possession of a deadly weapon and in 1989 with possession of a handgun.

that the number of his prior convictions demonstrated that Ford was a "career criminal."

In denying the motion to suppress the evidence seized in the house, the motions judge said, in relevant part:

> It seems to me that the warrant provided probable cause to believe that this defendant was in fact selling heroin. And was selling it from that location that was sought to be searched. Now, the police knew that that's what they were dealing with. They then pulled the record of Mr. Ford. And Mr. Ford's record . . . goes back to . . . 1989 with continual contacts with the police for various criminal activity. Some of which is distribution of drugs . . . There are allegations of robbery with a dangerous and deadly weapon. Or wearing a handgun. Carrying a handgun. More than one of those . . . I think the norm is for heroin dealers to arm themselves, particularly where they keep their stash of drugs.

* * *

> In this case I think specifically the police were justified in doing what they did. And in executing the warrant in the way they executed it. And I don't think Mr. Ford's privacy was invaded one iota more or less by the way they executed the warrant in this case.

## III

### Ford's Standing to Protest the Search of the Car[2]

**** The issue of whether a non-owner of an automobile, who is not physically present when the automobile is seized,

---

2. When [an appellate court] reviews the circuit court's denial of a motion to suppress, ordinarily our review is limited to the evidence presented at the suppression hearing. *See Owens v. State,* 399 Md. 388, 403, 924 A.2d 1072, 1080 (2007) *(citing State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439, 443–44 (2003)). We give deference to the trial court's factual findings, upholding them unless they are clearly erroneous. *Id.* We consider the evidence and all inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing

has standing to challenge the search of the vehicle has been discussed in only one prior Maryland appellate decision. That decision is *Coomes v. State*, 74 Md.App. 377, 537 A.2d 1208 (1988). *Coomes*, however, provides little guidance because the defendant in that case presented almost no evidence in regard to the standing issue.

The reason that so little evidence on the standing issue was presented in *Coomes* was because the State waited until after the evidence concerning probable cause to search had been presented and after the defendant had argued the probable cause issue, before bringing up its contention that the defendant had no standing to challenge the search. *Id.* at 383–84, 537 A.2d 1208.

Brenda Coomes was arrested in connection with a breaking and entering. *Id.* at 380, 537 A.2d 1208. Witnesses reported that after the crime the man and woman who had committed the break-in left in a 1984 Ford Bronco. *Id.* A description of the vehicle and its occupants was broadcast. The suspects were subsequently located on McGlothlin Road in Cecil County. *Id.* After a 1986 Bronco was secured, Maryland State Police Officers approached Brenda Coomes and her male companion. Ms. Coomes immediately admitted that she and her companion had committed the breaking and entry.

The police filed an application for a search warrant asking for permission to search the Ford Bronco as well as the premises [208 McGlocthlin Road] where Brenda Coomes and her companion had been located. Despite what was said in the application for the warrant, the search warrant itself authorized the police to search the premises, but not the Ford Bronco. *Id.* at 380–81, 537 A.2d 1208.

While Coomes was in custody, the police executed the search warrant. They searched not only the premises at 208

---

party on the motion. *Id.* Nonetheless, we make an independent constitutional evaluation, by "reviewing the relevant law and applying it to the facts and circumstances of the individual case."

*Jones v. State*, 407 Md. 33, 45, 962 A.2d 393, 399 (2008).

McGlocthlin Road but also searched the Ford Bronco that was parked in front of the house. *Id.* at 381, 537 A.2d 1208. Coomes filed a motion to suppress the introduction of drugs that were found in both the house and in the vehicle. *Id.*

At the suppression hearing, a detective testified that Ms. Coomes told him that the vehicle she was driving that day was a 1986 Ford Bronco that belonged to her husband. A detective also testified that he did not know in whose name the Bronco was titled. Furthermore, he could not recall whether Ms. Coomes' keys, which he confiscated, included keys to the Bronco. *Id.* at 395, 537 A.2d 1208. The motions judge ruled that Ms. Coomes had not established that she had standing to challenge the search of the Ford Bronco. *Id.* at 383, 537 A.2d 1208.

In reviewing the standing issue, this Court ruled that, at most, the testimony established that Ms. Coomes was driving the vehicle that the police searched on the day that she was arrested. *Id.* at 396, 537 A.2d 1208. Also proven [based on what she had told arresting officers] was that Ms. Coomes' name was not on the title to the vehicle. *Id.* In *Coomes*, we stated:

> It may very well be that [Ms. Coomes], had she presented evidence on the point, could have established her standing to challenge the search of the Bronco; however, on this record, we are unable to say that the court was truly erroneous in ruling that she did not have standing.

*Id.* at 396, 537 A.2d 1208. This last quoted sentence strongly suggests that the mere fact that Ms. Coomes did not have legal title to the vehicle would not, *ipso facto*, mean that she did not have standing to challenge the search of the vehicle. What was suggested in *Coomes*, was said explicitly in *Whiting v. State*, 389 Md. 334, 337, 347–48, n. 9, 885 A.2d 785 (2005), viz:

> The history of standing under the Fourth Amendment was summarized in *Graham v. State*, 47 Md.App. 287, 421 A.2d 1385 (1980), in an opinion authored by Judge Wilner, who now sits on this Court, when he was on the Court of Special

Appeals. After exploring its history, Judge Wilner succinctly opined:

[T]he "standing" question is a preliminary one that should be resolved, for if appellant has no lawful right to contest the respective searches, the question of their validity becomes moot. Putting the cart before the horse may sometimes be easier to do, but it does make the ultimate journey considerably more difficult. When may a person be heard to complain that his Fourth Amendment right has been violated?

Judge Wilner then answers his question by stating:

The considerations here are not so simple as they may appear at first glance. Even under *Rakas [v. Illinois,]* (439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)), *the precepts of civil property law, though highly relevant, are not necessarily controlling.* The legitimacy of one's expectation of privacy is in large measure a function of its reasonableness, and that, in turn, is determined to some extent by the elements of time, place, and circumstance.

(Internal citations omitted) (emphasis added).

Ms. Coomes, unlike Ford, made an exceedingly feeble effort to prove standing. In *Coomes,* there was neither direct nor circumstantial evidence introduced that showed that Ms. Coomes had permission of the owner to drive the vehicle on the date it was searched or at any other time. Moreover, unlike the subject case, there was no proof that the non-owner drove the vehicle on a regular basis.

This Court, in *Colin and Heath v. State,* 101 Md.App. 395, 646 A.2d 1095 (1994), was called upon to decide "whether the operator of a rented automobile who is not listed in the rental agreement as an authorized driver and is specifically precluded from driving the automobile has standing to challenge the constitutionality of a search of that automobile." *Id.* at 397, 646 A.2d 1095.

Gordon Colon was a passenger in a motor vehicle owned by Enterprise Rental Car Company ("Enterprise"). *Id.* at 398, 646 A.2d 1095. The rental car, driven by Orville Heath, cut in front of a police vehicle driven by Deputy Mike Houck of the

Wicomico County Sheriff's Office. *Id.* When Deputy Houck stopped the vehicle, Heath produced an agreement showing that the car he was driving had been rented to one Wanda Harrold by Enterprise. The agreement did not list either Heath or his passenger as authorized drivers. Heath, however, told Deputy Houck that Ms. Harrold was his girlfriend and that she had given him permission to drive the car. *Id.*

Deputy Houck asked Heath if he minded if he (Deputy Houck) searched the vehicle. According to Deputy Houck, Heath gave permission. *Id.* at 398–99, 646 A.2d 1095. A search of the vehicle uncovered cocaine valued at $25,600.00. *Id.* at 399, 646 A.2d 1095.

In resolving the issue of whether Heath had standing to challenge the search of the vehicle, Judge Alpert, speaking for this Court, mentioned a number of prior cases dealing with standing in situations where the defendant was driving the vehicle before a traffic stop and a search of the vehicle follows immediately thereafter. In doing so, the Court noted, as a general principle, "that an individual who uses an automobile with the permission of the owner normally does have standing." For that proposition, the Court cited the following cases:

*United States v. Rubio–Rivera*, 917 F.2d 1271, 1275 (10th Cir.1990) (explaining that "[w]here the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly has a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle."); *United States v. Garcia*, 897 F.2d 1413, 1417–18 (7th Cir.1990) (noting that the defendant who claimed to have borrowed the automobile from the owner did have standing to challenge the search of that automobile); *United States v. Blanco*, 844 F.2d 344, 349 (6th Cir.), *cert. denied*, 486 U.S. 1046, 108 S.Ct. 2042, 100 L.Ed.2d 626 (1988) (holding that defendant, listed as an authorized driver on the rental agreement, has standing to object to search of door panels of rented automobile); *United States v. Miller*, 821 F.2d 546, 548–49 (11th Cir.1987) (holding that defendant had standing to challenge search of

automobile borrowed from a friend); *United States v. Portillo*, 633 F.2d 1313, 1317 (9th Cir.1980) (holding that the defendant had standing to challenge the search of an automobile because he "had both permission to use his friend's automobile and the keys to the ignition and the trunk, with which he could exclude all others, save his friend, the owner."), *cert. denied*, 450 U.S. 1043, 101 S.Ct. 1763, 1764, 68 L.Ed.2d 241 (1981); *United States v. Posey*, 663 F.2d 37, 41 (7th Cir.1981) (concluding that the defendant "had an expectation of privacy in an automobile owned by his wife and over which he was exercising exclusive control pursuant to her permission at the time of the search."); *cert. denied*, 455 U.S. 959, 102 S.Ct. 1473, 71 L.Ed.2d 679 (1982). Additionally, it is established that the renter of an automobile has an expectation of privacy in it and therefore can assert standing. *United States v. Tragash*, 691 F.Supp. 1066, 1070 (S.D.Ohio 1988).

*Id.* at 402–03, 646 A.2d 1095.

Judge Alpert distinguished the cases just cited on the grounds that Heath "was the driver of a rented automobile which he borrowed from the lessee," but was not "listed as an authorized driver on the rental agreement," nor did Heath "produce evidence of any independent agreement with Enterprise allowing him to drive the automobile lawfully." *Id.* at 403, 646 A.2d 1095. In fact, "the contract between Enterprise and ..., [Heath's girlfriend] expressly prohibits the motor vehicle from being driven by anyone other than the Renter...." The Court ultimately ruled that the renter of the vehicle was without any authority to give Heath her permission to drive the automobile and that, even if Heath had a subjective expectation of privacy in the vehicle, such an expectation of privacy was not "one that we are willing to consider as reasonable." *Id.* at 405, 646 A.2d 1095.

In the case *sub judice*, the State contends that the rule that an individual who uses an automobile with the permission of the owner ordinarily does have standing, applies only when the defendant is driving at the time the seizure (the stop) of the automobile is made and the search is conducted immedi-

ately thereafter. The basis for this argument is that in cases where the driver is present when the automobile is seized, the driver is in control of the automobile at the time the alleged constitutional violation occurs, whereas in cases like the one *sub judice,* the driver lacks control because he or she is no longer present. The State has cited no case in which the court has found this distinction determinative and our research has uncovered none.

We have found five non-Maryland cases that illustrate the point that a defendant can have standing to challenge the warrantless search of an automobile notwithstanding the fact that the defendant was not the record owner of the vehicle and was not present at the time of the seizure. In chronological order those cases are: *In Interest of J.R.M.,* a child under 17 years of age, 487 S.W.2d 502 (Mo.1972); *United States v. Burke,* 506 F.2d 1165 (9th Cir.1974); *Pollard and Brown v. Indiana,* 270 Ind. 599, 388 N.E.2d 496 (1979), *New Mexico v. Soto,* 131 N.M. 299, 35 P.3d 304 (App.2001);and *United States v. Whitehead,* 428 F.Supp.2d 447 (E.D.Va.2006).

In the *J.R.M.* case, a sixteen year old boy ("J.R.M.") was suspected of having murdered a thirteen-year old girl. 487 S.W.2d at 503. The investigation of the murder uncovered the fact that the murder victim had been seen riding with a young male in a red Corvair a few days before her disappearance. *Id.* A witness provided the police with a description of the vehicle. *Id.* Two police officers went to a school where they learned the name of a male student [J.R.M.] who's last name corresponded with a sticker the witness had seen on the red Corvair. *Id.* A few days later, the police located the car in a downtown parking lot where J.R.M.'s father had rented a parking space. *Id.* at 504. With no one around, police officers had the car towed to a facility where they conducted a thorough examination of the red car. *Id.* Inside the car, police discovered evidence that incriminated J.R.M. *Id.* Prior to trial, J.R.M. filed a motion to suppress the evidence obtained as a result of the search of the red Corvair. *Id.* It was developed at the suppression hearing that the juvenile lived with his parents where the Corvair was usually kept.

The boy had a right to use the car at any time, had a key to the vehicle, and drove the car to school each day. *Id.* at 509. A juvenile court judge ruled that J.R.M. did not have standing to challenge the search of the automobile. The Missouri Supreme Court, sitting *en banc,* held that J.R.M. did have standing. *Id.* The Court said:

> The question . . . becomes one of whether he [J.R.M.] must show more to establish standing as to the search of the Corvair than he would have been required to do in the case of a search of the bathroom in the house where he lived. In our view, the standard for establishing standing should be and is the same in both cases. In *Katz* the Supreme Court considered the issue of standing in regard to intrusion into the privacy of a public telephone booth. *The test applied was the same as it would have been if a residence had been involved.* We perceive no reason for a different approach or test where the search is of an automobile. It is true that the Supreme Court in *Chambers v. Maroney, supra,*[ 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) ] and *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, relaxed under certain circumstances the requirements as to a right of search and seizure of motor vehicles because of their mobility, *but those holdings do not imply that any difference in the requirements for standing should exist in the search of a home, office, phone booth, or automobile. If we should deny standing to appellant herein under the factual situation that existed, we logically also would be required to deny standing to the wife of the owner of an automobile who had no title thereto but who used the car regularly, as did the appellant here.* We do not believe that such denial of standing would accord with the recent United States Supreme Court decisions on that question. Accordingly, we hold that appellant did have standing to seek to suppress the evidence obtained by search and seizure of the Corvair.

487 S.W.2d at 509 (emphasis added).

The facts in the *J.R.M.* case, insofar as standing is concerned, are quite analogous to those here present. But that

case was decided prior to the Supreme Court's decision in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), which involved the issue of whether a passenger in a car that was stopped had standing to challenge the search of the car. *Id.* at 130–31, 99 S.Ct. 421. In holding that the passenger lacked standing, the *Rakas* Court said:

> We are concerned here with an automobile search. Nothing is better established in Fourth Amendment jurisprudence than the distinction between one's expectation of privacy in an automobile and one's expectation when in other locations. We have repeatedly recognized that this expectation in "an automobile ... [is] significantly different from the traditional expectation of privacy and freedom in one's residence." *United States v. Martinez–Fuerte*, 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976). In *United States v. Chadwick, supra*, 433 U.S., [1] at 12, 97 S.Ct., [2476] at 2484[, 53 L.Ed.2d 538 (1977) ], the distinction was stated more broadly.

*Id.* at 153–54, 99 S.Ct. 421.

Therefore, to the extent that the Missouri Supreme Court based its *J.R.M.* decision on the belief that no difference (insofar as standing is concerned) exists between a challenge to standing when the search of a car is at issue than when the search is of a residence, the reasoning of the *J.R.M.* opinion is not persuasive.

In *United States v. Burke*, 506 F.2d at 1171, the Court reached a conclusion similar to the one reached in the *J.R.M.* case. Robert Burke ("Burke") was arrested for bank robbery on August 28, 1973, while leaving his home in a 1973 Chevrolet van. *Id.* at 1167. The van was not seized at that point, however. Subsequently, the FBI secured permission to search the van from Burke's brother, who owned it. The FBI searched the van and found a pistol hidden therein. *Id.* Burke was later convicted of bank robbery and related charges. On appeal Burke challenged the validity of the search of the van and argued that the court improperly denied

his motion to suppress the evidence obtained as a result of the vehicle search. *Id.* at 1170. The *Burke* Court said:

> The Government's contention that the appellant is without standing to protest the search of the van rests upon the fact that record ownership and licensing of the van was in the name of the appellant's brother. However, the appellant testified that the van was really his, and that ownership and registration were in his brother's name only for the purpose of acquiring credit. The appellant also made an offer of proof to produce five witnesses who would verify the appellant's claim that the van was really his. The District Court declined this offer *but also explicitly stated that it did not find the appellant's standing to be in issue.* The court concluded that regardless of who owned the van, *defendant used it extensively.* The Supreme Court has stated:
>
>> It is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. *Jones v. United States,* 362 U.S. 257, 266, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).
>
> *As a result of his repeated use of the van, the appellant had a reasonable expectation of privacy and freedom from search in the use of the van.* See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The situation here is analogous to that of the tenant's right to freedom from search. *See Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964). The District Court properly concluded that there were no standing obstacles involved in the instant case.

*Id.* at 1170–71 (emphasis added).

The above-quoted language in *Burke,* which we have emphasized, provides support for Ford's position that he had standing in this case.

In *Pollard and Brown v. Indiana,* the defendants were charged with murder and kidnaping. 388 N.E.2d at 499–500. Prior to their arrest, the police learned that during the kidnaping the victims had been transported in a blue and white 1964 Chevrolet automobile. *Id.* at 501. The Chevrolet was owned by Willie B. Pollard, the wife of James Pollard, one of the defendants. *Id.* at 501–02. The police discovered the location of the vehicle near the residence of James Pollard, *Id.* at 501, and towed it to a garage where police officers, prior to obtaining a search warrant, began an inventory of the vehicle's contents. *Id.* at 502. The police recovered a knife from the front seat of the Chevrolet and also observed, but did not touch, the barrel of a gun. Several hours after the inventory had commenced, a police officer arrived at the garage with a warrant allowing the police to search the vehicle. *Id.* Pursuant to the warrant, the officers removed the firearm, lifted fingerprints, and removed certain other incriminating items from the trunk of the vehicle. James Pollard and others moved to suppress the evidence obtained as a result of the search. *Id.* at 501. The State maintained, as a threshold matter, that Mr. Pollard lacked standing to challenge the legitimacy of the search. The State stressed that Mr. Pollard did not own the vehicle-his wife did. Mr. Pollard contended, in response, that because the vehicle was owned by his wife he had a possessory interest in the vehicle. *Id.* at 502. In the *Pollard and Brown* case, the Indiana Supreme Court held that Mr. Pollard had standing to challenge the search. The court explained:

> Appellant Pollard's situation is somewhat different [from that of his co-defendant]. The searched automobile was apparently owned by Pollard's wife. The question then is whether or not Pollard has established that he had a legitimate expectation of privacy in an automobile owned by his wife. As the State points out, Pollard did not establish that his use of the vehicle was within his wife's permission. However, the *Rakas [v Illinois]* court pointed out that in defining the scope of Fourth Amendment interest's "arcane distinctions developed in property and tort law between

guests, licensees, invitees, and the like, ought not to control." *Rakas, supra,* at 439 U.S. 128, 99 S.Ct. [at] 430, 58 L.Ed.2d [at] 401. *Thus the legitimacy of a defendant's privacy expectations in the searched premises will not always turn upon whether his name appears on the deed, lease or certificate of registration. Surely, a husband's expectation of privacy while in an automobile titled to his spouse is as legitimate as that of the wife.* This is not to say that other factors, not present in this case, such as divorce or separation, would not affect the legitimacy of a husband or wife's privacy interest in property owned by his or her spouse. We hold only that under the facts of this case, appellant Pollard had a legitimate expectation of privacy in his wife's automobile such that any unreasonable search and seizure of the vehicle would amount to an infringement of his Fourth Amendment rights.

*Id.* at 503 (emphasis added).

Ford's evidence in regard to standing was at least as strong as that of James Pollard. Although Ford was not married to the owner, he (unlike Pollard) proved that he helped pay for the vehicle and regularly used it with the owner's permission.

The defendant in *Soto* was charged with burglary of an automobile repair shop. *State v. Soto,* 131 N.M. 299, 35 P.3d 304, 305–06 (N.M.App.2001). One of the issues presented on appeal was whether the defendant, Donisio Soto, had standing to object to the search of a vehicle when: 1) he was not present at the time of the search; 2) he did not own the vehicle; 3) he drove the vehicle frequently and 4) his girlfriend, Vera Rodriguez, who owned the car regularly allowed the defendant to drive the vehicle. *Id.* at 306. The *Soto* Court held that the defendant "had a reasonable expectation of privacy in the car he shared with his live-in companion." *Id.* at 307.

The case of *U.S. v. Whitehead,* 428 F.Supp.2d 447 (E.D.Va. 2006), like the case *sub judice,* involved the question of whether a permissive user of an automobile had standing to challenge the warrantless search of it. In *Whitehead,* the

police received a complaint regarding a fight at 968 Marcus Drive in Newport News, Virginia. *Id.* at 449. When the police arrived at the address they were informed by witnesses that Andre Whitehead ("Mr.Whitehead"), one of the men involved in the fight, had a gun in a nearby vehicle. *Id.* at 449. Upon further inquiry, the officers learned that the owner of the vehicle was Mr. Whitehead's wife, who eventually consented to a search of it. *Id.* When the vehicle was searched, the police found a handgun. Mr. Whitehead was charged with various offenses, including removing or altering a serial number on a firearm. *Id.* at 449. He filed a motion to suppress the gun found as a result of the warrantless search of the motor vehicle. *Id.* at 450. The Government responded to the motion by contending that Mr. Whitehead had no reasonable expectation of privacy in the vehicle, and therefore had no standing to challenge the search. *Id.* at 450. The *Whitehead* Court held that Mr. Whitehead did have standing to challenge the search. *Id.* at 451. The court explained:

> In this case, Defendant was not the owner of the vehicle that was searched. However, during the hearing, Mrs. Whitehead testified that Defendant provided money for fuel and maintenance of the vehicle, kept personal items in the vehicle, and used the vehicle as his primary mode of transportation. Mrs. Whitehead also stated that the vehicle was Defendant's vehicle and the only reason Defendant did not drive the vehicle was because he did not possess a driver's license. Defendant had authority to have others drive him places in the vehicle.
>
> *Defendant has provided evidence that shows that he had continuous access to the vehicle, unlimited use of the vehicle, and the ability to exclude others from the vehicle. See U.S. v. Rusher,* 966 F.2d [868] at 875 [4th Cir., 1992]; *United States v. Fernandez,* 430 F.Supp. 794, 798 (N.D.Cal. 1976) (reasonable expectation of privacy when defendant made substantial contributions to the rent, was free to come and go, maintained residence and visited frequently); *[United-ed States v. Sanchez,* 943 F.2d 110 (1st Cir.1991)] 114 (driver had no reasonable expectation of privacy in vehicle absent a history of regular use or a more intimate relation-

ship with the vehicle's owner). *Moreover, here Defendant provided regular maintenance on the vehicle and was married to the owner. Given the totality of the circumstances, Defendant has established a reasonable expectation of privacy in the vehicle.* Accordingly, the Court finds that Defendant has standing to challenge the validity of the search.

*Id.*

■ The facts in this case are analogous to—but not exactly the same as—those in *Whitehead.* Although not married to the owner, Ford had a long-time romantic relationship with the owner and, prior to his arrest, had used the car regularly for almost five years.

Ford presented strong circumstantial evidence that he possessed a key to the vehicle because, it will be recalled, he moved the vehicle from the rear of the house to the street in front of the house shortly after his fiancé left the premises and prior to her return. Also, the inference that Ford had a key is supported by the fact that he used the vehicle "all the time."

Ford's money was used to purchase the vehicle and he lived in the house where the vehicle was kept. Given the totality of the circumstances, the most important of which was that Ford proved that he drove the vehicle regularly with the permission of the owner, appellant met his burden of proving that he had a reasonable expectation of privacy in the vehicle.

In the alternative, the State argues that even assuming, *arguendo,* that Ford had standing to challenge the search, the search was nonetheless legal because the police had probable cause to search.

■ The State had the burden of proving that the warrantless search of the vehicle was legal. But, because the motions judge did not require it to do so, the State presented no evidence at the suppression hearing. Thus, we have no idea as to whether the State is correct when it argues that the police had probable cause to search the vehicle. Moreover, even if we looked outside the suppression hearing record, and looked at evidence produced at trial, which we normally are

not allowed to do (*see* footnote 2, *supra* ), we still would not be able to determine whether probable cause existed.

Because the motions court erred when it concluded that Ford lacked standing, we shall order a limited remand pursuant to Md. Rule 8–604(d).[3] Upon remand, the court should hold a new suppression hearing and determine whether the police had probable cause to search the vehicle owned by Ford's fiancé, but used regularly by Ford. *See Parker v. State*, 402 Md. 372, 388, 406, 936 A.2d 862 (2007) (limited remand is the appropriate remedy when a new suppression hearing is warranted); *See also Jones v. State*, 379 Md. 704, 725–26, 843 A.2d 778 (2004); *Southern v. State*, 371 Md. 93, 104–05, 807 A.2d 13 (2002). If, upon remand, the court determines that the Baltimore County police officers who searched the Chevrolet Cavalier had probable cause to believe that the vehicle contained contraband or other evidence of a crime at the point that the search commenced, then Ford's convictions will stand. On the other hand, if the motions court determines that probable cause for the search did not exist, then a new trial should be granted.[4]

## III

The warrant that authorized the search of Ford's residence was issued after the enactment of Maryland Code (2001, 2006

---

3. Rule 8–604(d) provides:

 If the Court concludes that the substantial merits of a case will not be determined by affirming, reversing or modifying the judgment, or that justice will be served by permitting further proceedings, the Court may remand the case to a lower court. In the order remanding a case, the appellate court shall state the purpose for the remand. The order of remand and the opinion upon which the order is based are conclusive as to the points decided. Upon remand, the lower court shall conduct any further proceedings necessary to determine the action in accordance with the opinion and order of the appellate court.

4. In his brief, Ford points out that the admission into evidence of the small digital scale and the loaded handgun found in the trunk of the Chevrolet Cavalier strongly supported the State's case and as a consequence the admission of that evidence was not harmless. The State does not contend otherwise.

Repl.Vol.), Criminal Procedure Article ("C.P.") section 1–203(a). C.P., section 1–203(a)(2)(ii) and (iii) read, in pertinent part:

> (ii) An application for a search warrant may contain a request that the search warrant authorize the executing law enforcement officer to enter the building, apartment, premises, place, or thing to be searched *without giving notice of the officer's authority or purpose,* on the grounds that there is reasonable suspicion to believe that, without the authorization:
>
> 1. the property subject to seizure may be destroyed, disposed of, or secreted; or
>
> 2. The life or safety of the executing officer or another person may be endangered.

* * *

> (iii) If warranted by application as described in paragraph (2) of this subsection, authorize the executing law enforcement officer to enter the building, apartment, premises, place, or thing to be searched without giving notice of the officer's authority or purpose.

(Emphasis added.)

The portion of the statute just quoted became effective on October 1, 2005, and was enacted in direct response to the Court of Appeals' decisions in *Davis and Adams v. State,* 383 Md. 394, 859 A.2d 1112 (2004), and *State v. Carroll,* 383 Md. 438, 859 A.2d 1138 (2004). In both those cases, the Court of Appeals held that a Maryland judge has no authority to issue a search warrant allowing the police to make a "no knock" entry. *See Davis v. State,* 383 Md. at 427–28, 859 A.2d 1112; *State v. Carroll,* 383 Md. at 446, 859 A.2d 1138.

Ford argues that the portion of the search warrant allowing the police to enter his home without knocking or otherwise announcing their presence was invalid and therefore the items seized from his home should have been excluded from evidence. In support of that argument, he argues, as he did in the circuit court, that the application for the warrant contained

"nothing more than generic statements about drug traffickers and presented no evidence that Mr. Ford posed a threat to officer safety." He also contends that although the requirement "that particularized circumstances establishing a reasonable suspicion of exigency be shown does not mandate that officers show, to an absolute certainty, that their safety is jeopardized," the officers who apply for the warrant must nevertheless be able to at least "point to some articable reason why in a particular case, the preference for knocking and announcing their presence would not be appropriate in this case" (*citing State v. Carroll*, 383 Md. at 460, 859 A.2d 1138). The State advances two reasons why the evidence seized as a result of the "no knock" warrant should not have been suppressed. First, it claims that the "exigent circumstances" set forth in the application for the search warrant justified the issuance of a warrant allowing the police to enter Ford's residence without knocking or otherwise announcing their presence. Alternatively, the State argues that even assuming, *arguendo*, that the District Court judge erred in signing the warrant allowing the police officers to make a "no knock" entry, suppression of that evidence was not required in light of the U.S. Supreme Court's decision in *Hudson v. Michigan*, 547 U.S. 586, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006), and the opinion by this Court in *State v. Savage*, 170 Md.App. 149, 906 A.2d 1054 (2006). We need not decide whether the State's first argument has merit,[5] because the State's second argument is well-founded.

In *Hudson*, as here, the police obtained a warrant authorizing a search of the defendant's home. 547 U.S. at 588, 126 S.Ct. 2159. The State of Michigan later conceded that the entry by the police into the defendant's home was a "knock-and-announce" violation. Therefore, the only issue presented to the Supreme Court was "whether the exclusionary rule was appropriate for such a violation" of the Fourth Amendment.

---

**5.** The State does not argue that the "good faith exception" to the exclusionary rule, as enunciated in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), is applicable.

*Id.* at 590, 126 S.Ct. 2159. Justice Scalia, speaking for the *Hudson* majority, answered that question in the negative. He said:

> The social costs of applying the exclusionary rule to knock-and-announce violations are considerable .... and the extant deterrence against them are substantial-incomparably greater than the factors deterring warrantless entries when *Mapp* [*v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)] was decided. Resort to the massive remedy of suppressing evidence of guilt is unjustified.

*Id.* at 599, 126 S.Ct. 2159.

In *State v. Savage, supra,* Judge Moylan, speaking for this Court, provided a scholarly analysis of the exclusionary rule in general and the *Hudson* case in particular. 170 Md.App. at 198–211, 906 A.2d 1054. As part of that analysis, the following was said:

> The exclusion of evidence .... is not a sanction randomly available for any police misconduct. Before evidence may be excluded, it must be shown that the evidence was, in fact, the product of the Fourth Amendment violation in issue, not simply that it was recovered after the violation. *Hudson v. Michigan* explained that the evidence recovered from the warranted search in that case would have been recovered even if the police had delayed their entry for another 20 or 30 seconds, rather than entering the house prematurely. The evidence was produced as a result of the search warrant, not as a result of the "knock and announce" violation. The evidence would have been recovered even if the police had not jumped the gun and entered a few moments earlier than they should have entered. That it might have been recovered 15 seconds later rather than 15 seconds earlier was utterly immaterial.
>
> [E]xclusion may not be premised on the mere fact that a constitutional violation was a "but-for" cause of obtaining evidence.... In this case, the constitutional violation of an illegal manner of entry was not a but-for cause of obtaining the evidence. Whether that preliminary mis-

step had occurred or not, the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house.

547 U.S. at 592, 126 S.Ct. at 2164, 165 L.Ed.2d at 64–65 (emphasis omitted).

In his concurring opinion, Justice Kennedy very articulately set out the necessity for a causal link between the Fourth Amendment violation and the evidence sought to be suppressed.

Under our precedents the causal link between a violation of the knock-and-announce requirement and a later search is too attenuated to allow suppression. Cf. *United States v. Ramirez*, 523 U.S. 65, 72 n. 3, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998) (application of the exclusionary rule depends on the existence of a "sufficient causal relationship" between the unlawful conduct and the discovery of evidence). When, for example, a violation results from want of a 20–second pause but an ensuing, lawful search lasting five hours discloses evidence of criminality, the failure to wait at the door cannot properly be described as having caused the discovery of evidence.

\* \* \*

In this case the relevant evidence was discovered not because of a failure to knock-and-announce, but because of a subsequent search pursuant to a lawful warrant. 547 U.S. at 603, 126 S.Ct. at 2171, 165 L.Ed.2d at 72 (emphasis omitted).

When the evidence in issue may follow the violation but is not the product of the violation, there is no conceivable justification for paying the high social cost of excluding it.

*Id.* at 203–05, 906 A.2d 1054.

■ In the subject case, as in *Hudson*, the evidence obtained from the defendant's house was not the "product of a violation" of the "knock-and-announce" rule because: 1) the police had a search warrant that set forth probable cause for

its issuance [6] and 2) even if the police had knocked and announced their presence, waited for an appropriate period of time for a response, and then entered Ford's house, the heroin would still have been found. Therefore, under the principles enunciated in *Hudson,* even if we were to assume, *arguendo,* that Ford's rights were violated by the failure of the police officers who executed the warrant to knock-and-announce prior to entry, that violation would not warrant the suppression of the evidence under the Fourth Amendment to the United States Constitution. At oral argument, Ford's counsel conceded that this is true. Ford contends, however, *citing Parker v. State,* 402 Md. at 406, 936 A.2d 862, that under Maryland common law there exists an exclusionary remedy even though none exists under the Fourth Amendment. Ford bases that argument on the following statement found in *Parker:* "Whether . . . an exclusionary rule [for knock-and-announce violation] should be applied when there are violations of the Maryland 'knock-and-announce' principle in other cases, or in cases arising after the effective date of [C.P., section 1–203(a) ], are matters which we leave for another day." *Id.* We interpret the sentence just quoted as meaning that the Court of Appeals will leave for another day the issue of whether it is willing to change Maryland common law or Maryland constitutional law or both. As will be demonstrated, nothing said in *Parker* changes the fact that, as things now stand, in criminal cases no rule exists under either the Maryland Constitution or under Maryland common law that requires the exclusion of physical evidence seized due to police misconduct.

■ Before discussing Ford's contention in detail, it is important to make a distinction. It is clear that under Maryland common law, police, even if armed with a search warrant, are (with certain exceptions) not allowed to enter a person's

---

6. Ford does not contend that the police lacked probable cause for the issuance of the search warrant. He contends only that the application did not contain facts that justified the authorization for the police to execute the warrant without first knocking or otherwise announcing their presence.

home without first announcing their presence and demanding admission. *See, e.g., Henson v. State,* 236 Md. 518, 522–24, 204 A.2d 516 (1964). But it is one thing to prohibit certain actions by the police, and quite another to say that under Maryland common law the sanction in criminal cases for such police misbehavior is suppression of the evidence seized by the police after their entry. As will be demonstrated, under Maryland common law, suppression of the physical evidence in a criminal trial has never been a sanction.

The *Parker* case, upon which Ford places exclusive reliance, had a very complicated procedural background. 402 Md. at 376–78, 400–02, 936 A.2d 862. And to understand the fact that *Parker* did not change Maryland Constitutional or common law, it is necessary to understand that background.

At issue in *Parker* was the validity of a "no knock" warrant that was issued in 2002, which was more than two years prior to the enactment of the statute [C.P. § 1–203(a)(2)(ii) and (iii) ] that authorizes the issuance of such a warrant. In *Parker,* a District Court judge signed a warrant authorizing the police to enter the defendant's home without knocking or otherwise announcing their presence. *Id.* at 378, 936 A.2d 862. The circuit court found that the District Court judge had "sufficient probable cause" to issue the warrant; but the circuit court also found that the application for the warrant did not demonstrate that a "no knock" warrant was necessary. The circuit court nevertheless declined to suppress the evidence based on the fact that the officer who executed the warrant acted in good faith. *Id.* at 377–78, 936 A.2d 862.

On appeal to this Court, *Parker* argued, *inter alia,* based on language contained in *Davis and Adams v. State,* 383 Md. at 427–28, 859 A.2d 1112 (2004), that the motion to suppress should have been granted. In the *Davis and Adams* case, the Court of Appeals held:

[A] judicial officer in Maryland, under current Maryland law may not issue a 'no-knock' warrant. Rather, the propriety of a 'no-knock' entry will be reviewed and determined on the

basis of the facts known to the officers at the time of entry, rather than at the time of the application for the warrant. *Id.* at 427–28, 859 A.2d 1112. In *Parker*, a panel of this Court remanded the case to the circuit court to determine "whether the specific facts known to the officer at the moment they entered . . . [Parker's residence]including whatever facts came to their attention between the time when they obtained their warrant and the time of their entry—justified a "no-knock" entry into the residence. If the answer to this question was "no," the court was to determine whether "in light of the [*Davis and Adams v. State and State v. Carroll*, 383 Md. 438[, 859 A.2d 1138] (2004) ] opinions . . ., the evidence seized is nonetheless admissible under the 'good-faith' exception to the exclusionary rule." *Parker*, 402 Md. at 388, 936 A.2d 862.

*Parker* filed a petition for *certiorari* and, insofar as here pertinent, made two contentions: 1) that the "good faith exception" does not apply where, at the time of the execution of the warrant, no statute allowed a Maryland court to authorize a "no knock" warrant; and 2) that the "no knock" entry into his residence violated "either the Fourth Amendment or Maryland law," and as a consequence the evidence should have been suppressed. *Id.* at 389, 936 A.2d 862. *Certiorari* was granted by the Court of Appeals on June 14, 2006. 393 Md. 245, 900 A.2d 751. Two days after *certiorari* was granted, *Hudson v. Michigan* was decided by the Supreme Court. In his brief filed in the Court of Appeals, *Parker* argued that it would be unfair to apply *Hudson* to his case, because that case was not decided until long after his appeal was filed. *Id.* He also argued that Article 26 of the Maryland Declaration of Rights and Maryland common law required, as an appropriate remedy for the "no knock" entry, the exclusion from evidence of all evidence seized. *Id.* at 389, 936 A.2d 862.

The State argued in the Court of Appeals that the evidence should not be suppressed based on the *Hudson v. Michigan* decision. In regard to the arguments concerning Maryland law, the State contended that Parker's rights should be construed *in pair materia* with the Fourth Amendment as construed in *Hudson*. *Id.* at 390, 936 A.2d 862.

The Court of Appeals ruled in *Parker* that the State could not rely on the *Hudson v. Michigan* case because it "failed to challenge the adverse decision of the Court of Special Appeals, or raise the issue of a Maryland exclusionary rule by filing a cross-petition for a *writ of certiorari.*" *Id.* at 401, 936 A.2d 862. The Court stressed that the State, in its answer to Parker's *certiorari* petition, took the position that the Court of Special Appeal's judgment was correct. *Id.* In the words of the *Parker* court, "[i]f the State were aggrieved by the vacation of the Circuit Court's judgments and the remand for a new suppression hearing, and desired a reversal of the Court of Special Appeals' judgment, it was incumbent upon the State to seek timely review of the intermediate appellate court's judgment. . . ." *Id.* at 404, 936 A.2d 862. As a consequence of all the above, the Court ruled that it would be "contrary to settled Maryland law" to allow the State to argue for a reversal of a judgment to which the State had consented. *Id.* at 405, 936 A.2d 862. The *Parker* Court also held that in light of its opinion "in *Davis* and *Adams v. State,* at least in cases not subject to [C.P., section 1–203(a)(2)(ii) and (iii), which allowed courts to issue "no knock" search warrants], the 'good-faith' exception, was inapplicable under the Maryland common law 'knock-and-announce' principles." *Id.* at 406, 936 A.2d 862.

The *Parker* Court ultimately ruled that the case should be remanded for a new suppression hearing and a determination, in accordance with the principles enunciated by the Court in the *Davis and Adams* case, as to whether the drugs seized were admissible. If the evidence was determined to be admissible, then Parker's controlled dangerous substance ("CDS") conviction was to be affirmed. If the evidence was deemed inadmissible, a new trial as to the CDS charge was to be ordered. *Id.* at 406, 936 A.2d 862. In the words of the *Parker* Court, "[t]his is a very limited decision. . . ." *Id.* at 399, 936 A.2d 862.

█ In *Parker,* Judge Eldridge, speaking for the Court, suggested that the Court might want to change the common

law as previously enunciated in *Meisinger v. State*, 155 Md. 195, 141 A. 536 (1928), and *Lawrence v. State*, 103 Md. 17, 63 A. 96 (1906). He said that, on occasion, the Court of Appeals had recognized limited exclusionary principles on the basis of Maryland common law. *Id.* at 394, 936 A.2d 862. In support of that statement, the Court first cited two civil cases. *Id.* One was *Chase v. State*, 309 Md. 224, 253, 522 A.2d 1348 (1987), which dealt with a probation revocation proceeding. *Id*[7]. Evidence in that case was excluded where the probation officer had acted in bad faith and not as a reasonable officer. That decision was based on fairness and the need to deter further improper conduct by government officials. The second case relied on was *Sheetz v. Mayor and City Council of Baltimore*, 315 Md. 208, 215, 553 A.2d 1281 (1989), which involved a civil administrative discharge proceeding. *Id.* at 215–16, 553 A.2d 1281. In *Sheetz*, the Court remanded the case for a new administrative hearing to determine whether the police acted in good faith in seizing certain evidence. *Id.* at 215–16, 553 A.2d 1281. The *Parker* Court also cited *MVA v. Richards*, 356 Md. 356, 377–78, 739 A.2d 58 (1999), for the proposition that a "bad faith" exclusionary rule was incorporated into regulations governing administrative driver's license suspension proceedings. The *Parker* Court also stated that the case of *Davis and Adams v. State*, a case involving "no knock" entry that was decided prior to the *Hudson* decision and prior to the enactment of a statute specifically authorizing "no knock" warrants, was decided "upon both the Fourth Amendment and Maryland common law." *Id.* at 389, 936 A.2d 862. According to the *Parker* decision, the *Davis and Adams* decision as well as *Henson v. State*, 236 Md. 518, 204 A.2d 516 (1964), were "logically grounded" upon "the applicability of an exclusionary rule for violation of the Maryland 'knock and announce' principle." 402 Md. at 399–400, 936 A.2d 862.

---

7. In Maryland, a probation revocation proceeding is classified as a civil proceeding. *State v. Flansburg*, 345 Md. 694, 700, n. 5, 694 A.2d 462 (1997).

It may be accurate to say that the *Henson* decision was "logically grounded" upon the existence of a Maryland exclusionary rule but, logic aside, the *Henson* opinion never once mentioned a Maryland common law exclusionary rule. The holding in *Henson*, which was decided after *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, (1961), was as follows:

> We hold that in the case before us the actions of the police in breaking into the premises without warning were reasonable, permissible and legal and the evidence seized was admissible against the appellant.

The Supreme Court has held that binding federal constitutional safeguards are not affronted by such a holding. In *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726, it was observed that the entry by police officers was without compliance with the California statute requiring notice in that they had entered unannounced, without permission and by force, in order to prevent destruction of narcotics, but was valid under California law as 'within a judicial exception which had been engrafted on the statute by a series of decisions * * * and that the non-compliance was therefore lawful.' The Supreme Court concluded . . . :

> We therefore hold that in the particular circumstances of this case the officers' method of entry, sanctioned by the law of California, was not unreasonable under the standards of the Fourth Amendment as applied to the States through the Fourteenth Amendment.

236 Md. 518, 524, 204 A.2d 516 (1964).

In one sense it is true that the *Davis and Adams* case were decided based on the Fourth Amendment and Maryland common law. In that decision the Court said: "The Maryland knock-and-announce requirement is rooted in the common law and is consistent with and mirrors, Supreme Court precedent." 383 Md. at 411, 859 A.2d 1112. But, there is not one word in the *Davis and Adams* case that suggests that Maryland has its own exclusionary rule.

Two important factors distinguish *Parker* from this case. First, the State, at all times here pertinent, did rely on

*Hudson v. Michigan.* Second, in this case, when the "No Knock" warrant was issued, a Maryland statute authorized the issuance of such a warrant.

The common law in Maryland is that this State does not recognize (in criminal cases) an exclusionary rule when physical evidence is illegally seized by the police. *See Chu v. Anne Arundel County,* 311 Md. 673, 677–86, 537 A.2d 250 (1988) (reviewing history of attempts to develop an exclusionary rule by statutes). This was made clear in *Meisinger v. State,* 155 Md. 195, 141 A. 536 (1928). In *Meisinger,* it was determined that the search warrant at issue was illegally issued. *Id.* at 199, 141 A. 536. Nevertheless, the *Meisinger* Court ordered that the liquor that was seized as a result of the execution of the illegally issued warrant was admissible in evidence. The *Meisinger* Court relied on *Lawrence v. State,* 103 Md. 17, 63 A. 96 (1906), after noting that "authorities are divided" into those supporting the rule that illegally obtained evidence is admissible and those that take a contrary rule. 155 Md. 195, 197, 142 A. 190 (1928). The *Meisinger* Court then said:

Among the former this court is to be found, it having definitely determined that the rule which allows evidence of this character to be admitted is in force for the guidance of the courts and the admission of testimony therein in this state. This conclusion was reached by our predecessors in the case of *Lawrence v. State,* 103 Md. 17, 63 A. 96, and must be taken now as conclusive on the question, so far as this state is concerned. It was said in that case: "In the recent and valuable work on Evidence of Professor Wigmore it is affirmed, upon an exhaustive and discriminating review of the authorities, that it is universally conceded that chattels and documents in the possession of an accused party are within the protection of the constitutional provisions in question, if sought to be produced in evidence through process against him as a witness: but if obtained from him otherwise than by the use of such process they are not within the privilege which these provisions confer. *4 Wigmore on Evidence,* sec. 2264." The court then adopts the rule as laid down in 1 *Greenleaf on Evidence,* sec. 254,

that "though papers and other subjects of evidence may have been illegally taken from the possession of the party against whom they are offered, or otherwise unlawfully obtained, this is no valid objection to their admissibility, if they are pertinent to their issue. The court will not take notice of how they were obtained, whether lawfully or unlawfully, nor will it form an issue to determine that question." This statement of the rule has been adopted in the opinion of many of the courts, and may with certainty be denominated the rule more largely adhered to throughout the Union.

*Id.* at 197–98, 141 A. 536.

The fact that Maryland has no exclusionary rule was fully discussed in *Howell v. State,* 60 Md.App. 463, 483 A.2d 780 (1984). In *Howell,* we noted:

Maryland, of course, has no exclusionary rule. Following the lead of Judge Cardozo in *People v. Defore,* 242 N.Y. 13, 150 N.E. 585 (1926), Maryland is one of the approximately thirty jurisdictions that affirmatively rejected the exclusionary rule. *Lawrence v. State,* 103 Md. 17, 63 A. 96 (1906); *Meisinger v. State,* 155 Md. 195, 141 A. 536 (1928); *Lambert v. State,* 196 Md. 57, 75 A.2d 327 (1950); *In Re Special Investigation No. 228, supra,* 54 Md.App. [149] at 160, 458 A.2d 820 [1983]. The Maryland Legislature enacted a limited exclusionary rule, known as the Bouse Act, by Chapter 194 of the Acts of 1929. It specifically exempted all felonies and even certain of the more serious misdemeanors. In 1973, moreover, Maryland repealed even the limited statutory exclusion called for by the Bouse Act.

*Id.* at 468, n. 2, 483 A.2d 780.

Article 26 of the Maryland Declaration of Rights reads:

That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

 Ordinarily, Article 26 of the Declaration of Rights is to be read *in pari materia* with the Fourth Amendment.[8] Very recently, in *Jones v. State*, 407 Md. 33, 46 fn. 2, 962 A.2d 393, 400 fn. 2 (2008), the Court of Appeals noted:

Petitioner ... contends that the detectives' search was unlawful under Article 26 of the Maryland Declaration of Rights. Though the language of Article 26 is not identical to the language of the Fourth Amendment to the United States Constitution, we have construed Article 26 as being *in pari materia* with the Fourth Amendment and have accepted as persuasive the Supreme Court's construction of the Fourth Amendment. *See Scott [v. State]*, [366 Md. 121] at 139 n. 2[, 782 A.2d 862] n. 2 [2001]; *Gadson v. State*, 341 Md. 1, 668 A.2d 22 (1995), *cert. denied*, 517 U.S. 1203, 116 S.Ct. 1704, 134 L.Ed.2d 803 (1996); *Gahan v. State*, 290 Md. 310, 430 A.2d 49 (1981). Our conclusion that petitioner's Fourth Amendment rights were not violated during the detectives' investigation and subsequent search and seizure of the rental car, applies equally to petitioner's Article 26 claim.

In *Fitzgerald v. State*, 153 Md.App. 601, 682 n. 4, 837 A.2d 989 (2003), *affirmed*, 384 Md. 484, 864 A.2d 1006 (2004), we pointed out:

*Maryland has no independent exclusionary rule for physical evidence. Maryland has always been among the overwhelming majority of American states that have, on balance, opted against an exclusionary rule for search and seizure violations.* The only extant exclusionary rule that the appellant can call upon is that imposed upon Maryland in 1961 by *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Mapp's exclusionary rule, of course, is available only for violations of the federal Fourth Amendment.

---

8. The *Parker* Court pointed out however, that simply because a Maryland Constitutional provision or a common law principle is *in pari materia* with a federal constitutional provision does not mean that it will always be interpreted or applied in the same manner. 402 Md. at 400, 936 A.2d 862 (2007).

*See also Miller v. State,* 151 Md.App. 235, 246, 824 A.2d 1017 (2003) ("But even if the officers did not have authority under § 2–102 of the Maryland Criminal Procedure Article to arrest appellant, the court had no legal basis upon which to suppress the evidence obtained from that arrest. Maryland does not have an independent exclusionary rule," nor does § 2–102 create one).

Maryland cases have consistently held that Article 26 of the Declaration of Rights cannot be enforced by exclusion of evidence. *See Padilla v. State,* 180 Md.App. 210, 236–37, 949 A.2d 68 (2008) (collecting cases), *cert. denied,* 405 Md. 507, 954 A.2d 468 (2008). And, as acknowledged in Parker, those cases have not been overruled.[9]

For the above reasons, we reject Ford's argument that the evidence recovered from his home should have been kept out of evidence based on an exclusionary rule founded upon Maryland common law and/or constitutional law.

**JUDGMENT VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS AS SET FORTH IN THIS OPINION; COSTS TO BE PAID FIFTY–PERCENT (50%) BY BALTIMORE COUNTY AND FIFTY–PERCENT (50%) BY APPELLANT.**

---

**9.** In *Parker,* the Court said:

> This court has not, since *Meisinger,* and the enactment and later repeal of the Bouse Act, decided generally whether Maryland constitutional and/or common law recognizes an exclusionary rule for evidence resulting from an illegal search and seizure.

402 Md. 372, 394, 936 A.2d 862 (2007).